35 P.3d 1144 (2001)
178 Or. App. 251
In the Matter of Jaycee Castellano, a Minor Child.
STATE ex rel JUVENILE DEPARTMENT OF WASHINGTON COUNTY, Respondent,
v.
Jaycee CASTELLANO, Appellant.
J980756; A106224
Court of Appeals of Oregon.
Argued and Submitted July 3, 2001.
Decided December 5, 2001.
Susan D. Isaacs, Beaverton, argued the cause and filed the brief for appellant.
Kevin M. Hylton, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.
Before EDMONDS, Presiding Judge, and ARMSTRONG and KISTLER, Judges.
EDMONDS, P.J.
Youth appeals from an adjudication that he is within the jurisdiction of the court for committing an act that, if committed by an adult, would constitute the unlawful use of a weapon. ORS 166.220; ORS 419C.005(1). He first assigns error to the denial of his motion to suppress, contending on appeal that his statements to police officers were inadmissible because he was not informed of his Miranda rights before the custodial interrogation occurred. He also contends that the evidence is insufficient to find him within the jurisdiction of the court on the petition. We reverse and remand for a new adjudicatory hearing without the evidence of the custodial statements.
Youth witnessed a domestic assault on his stepmother by her boyfriend, Shoals, at youth's residence. The assault occurred around 4:00 a.m. and, after it occurred, Shoals left the residence. After leaving, Shoals also threatened and allegedly assaulted youth's girlfriend. The stepmother contacted the police, who began to look for Shoals. The stepmother then asked youth and another friend, Arms, to take Shoals's belongings out of her house and to leave them at Shoals's house, located nearby.
Youth and Arms made several trips on foot between youth's residence and Shoals's home between 4:00 and 5:00 a.m. (while it was still dark), carrying Shoals's belongings. Youth took along a baseball bat that hung loosely at his side. While looking for Shoals, the officers encountered youth on several occasions, *1145 and they told him to take the bat home, explaining that they would take care of the situation. Youth told the officers that he had seen Shoals twice after the assaults, that Shoals was still in the neighborhood, and that if the officers did not act within the next five minutes, youth would get his "homeboys" and take care of Shoals himself. While out of the officers' view, youth hit a brick wall with the bat, making a sound like a gunshot. Moments later, youth came back into the officers' view, carrying the bat. One officer asked youth for the bat, and youth complied. The officer then detained youth and frisked him. Another officer, Fresh, then began to question him. Youth was not given Miranda warnings, and the answers that he gave to Fresh's questions are the subject of his motion to suppress.
As a result of the above incident, the state filed a petition alleging that youth was within the jurisdiction of the juvenile court for having violated ORS 166.220. That statute provides:
"A person commits the crime of unlawful use of a weapon if the person:
"(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015[.]"
The petition alleged that youth unlawfully "carr[ied] and possess[ed] with intent to use unlawfully against [Shoals], a baseball bat, a dangerous and deadly weapon."
Before the adjudicatory hearing, youth moved to suppress his statements made to Fresh. He argued that he was in custody when he made the statements and that therefore, Miranda warnings were required before he was interrogated. The trial court heard testimony on the motion from Officers Rademacher and Fresh, the stepmother, the girlfriend, and youth. Fresh testified about the circumstances surrounding the questioning and the contents of youth's custodial statements, including the statement
"he told me that he was inside and got a baseball bat from inside the apartment and went outside and was looking for Mr. Shoals. He told me that he was trying to protect his mom and girlfriend."
Youth also testified, explaining that he told Fresh he was watching out for Shoals only to protect the house and its occupants. He then briefly explained the circumstances surrounding the custodial questioning and his position that he had carried the bat for self-defense. The trial court denied the motion to suppress, holding that youth's statements were voluntary and that the circumstances surrounding them were not coercive.
At the adjudicatory hearing, the state argued that the evidence showed that youth carried the baseball bat with the intent to assault Shoals. The state relied on youth's statements to the officers as evidence of his intent to use the baseball bat unlawfully. Youth's defense was that he was carrying the bat in self-defense or the defense of others. He explained that he told Fresh that he was "looking for Shoals" in the sense that he was trying to prevent any further violence to himself or to others. The court ultimately found youth to be within its jurisdiction, and youth appeals.
On appeal, the state concedes that youth was in custody or in circumstances tantamount to custody when Fresh questioned him. See, e.g., State v. Magee, 304 Or. 261, 263, 744 P.2d 250 (1987). It also concedes that the police did not give Miranda warnings to youth before he was questioned. The state's only argument on appeal as to the alleged involuntariness of youth's statements is that, under State ex rel Juv. Dept. v. Cook, 325 Or. 1, 932 P.2d 547 (1997), the error was waived or was harmless because youth took the stand at the adjudicatory hearing and "testified to the substance of his statements that he had previously sought to suppress." We conclude that implicit in the state's argument on appeal is that youth's custodial statements were made involuntarily.
We then turn to the question of whether the rule of Cook defeats youth's argument on appeal that the trial court erred in denying his motion to suppress. In Cook, the police believed that the youth had participated in a murder. Police officers questioned him without giving him Miranda warnings, and he made incriminating statements. In those statements, he acknowledged that he had *1146 been present at the shooting, that he knew who had pulled the trigger, and that he knew that the shooting was done to facilitate a car theft. During the questioning, the youth's mother was at the police station, trying to invoke the youth's right to counsel on his behalf, but her efforts were disregarded by the police. Cook, 325 Or. at 4, 932 P.2d 547.
The youth argued to the juvenile court (and on appeal) that his mother's effort to invoke his right to counsel should have been honored and that all questioning should have ceased when she invoked that right for him. The juvenile court denied his motion to exclude most of the statements. The youth then testified extensively about the events surrounding the shooting, going into more detail about his involvement than he had done during the officer's questioning. He testified that he had known the shooter for a long time, that he knew the shooter had a gun and had talked about killing the victim, that he had helped lure the victim into the woods, and that he had held the shotgun at one point and had helped drag the victim's body into the woods. He also acknowledged many of the facts about his involvement that other witnesses had testified to, including his whereabouts during the 24 hours before the shooting and the events that occurred after the shooting.
On appeal, the youth reiterated his right to counsel argument. Rejecting his argument, the Supreme Court held:
"After the juvenile court had made its ruling excluding some (but not all) of the statements made by [the youth] to Steele, there was an adjudicatory hearing. At that hearing, after considerable evidence had been introduced that tended to implicate [the youth] in the planning and carrying out of Marrs' murder, [the youth] took the stand and testified. In that testimony, he made several statements that were just as incriminating as the portion of [the youth's] statements to Steele that the juvenile court had already admitted.
"[The youth's] choice to testify at the hearing about the substance of the statements that he previously had sought to have suppressed defeats his argument. Whatever label is used-unpreserved error, harmless error, or waiver-[the youth's] own testimony in this case eliminated the possibility that the court's earlier ruling on the motion to suppress harmed him. See, e.g., State v. Walton, 311 Or. 223, 231, 809 P.2d 81 (1991) (defendant could not successfully claim reversible error in certain statements, because same information was contained in other statements whose admissibility defendant did not challenge)."[1]Cook, 325 Or. at 4-5, 932 P.2d 547.
Here, we follow the methodology of Cook in our review for errors of law regarding the trial court's denial of youth's motion to suppress. We inquire whether youth's testimony at the adjudicatory hearing defeats his argument and makes the admission of his involuntary custodial statements harmless. Under Cook, we inquire whether youth's other testimony at the adjudicatory hearing was "just as incriminating" as the statements made to Fresh during the custodial interrogation. Id. at 5, 932 P.2d 547. In using this approach, we note that Fresh testified about more than the statements made to him by youth, so we cannot exclude his testimony in its entirety as part of our harmless error inquiry. Instead, we consider all of his testimony about the circumstances surrounding youth's presence in the street in the middle of the night, including the fact that youth was carrying the bat. We also consider Fresh's testimony about youth's predetention statement that youth would get his "homeboys" if the police did not act. Finally, we consider all of youth's testimony that was elicited at the adjudicatory hearing as well as all other testimony admitted at the hearing.[2]
Generally, evidentiary error is harmless if there is little likelihood that the improperly *1147 admitted statements affected the finding that youth committed the requisite acts. Cf. Walton, 311 Or. at 230, 809 P.2d 81. Although youth's custodial statement that he was "looking for Shoals" would tend to support the inference that he intended to use the bat unlawfully against Shoals, other facts in the record lead to a contrary inference. According to three witnesses, youth and Arms made several trips to Shoals's house. During those trips, youth did not look for Shoals or attempt to find him. He saw Shoals three times within the period of time between the assault on the stepmother and the detention by the officers and made no attempt to assault him. In particular, youth saw Shoals immediately after Shoals assaulted the girlfriend, but youth "didn't chase after him," because he "thought he [Shoals] would have hurt [youth]." Instead, youth comforted and talked to his girlfriend about the assault. Then, after youth tried to console his girlfriend, he said he again "saw [Shoals] * * * on his porch, and I was just looking at him. But I didn't go after him." When asked why he didn't go after Shoals at that point, youth said, "because I didn't want to get arrested." Then, during one of the trips to return Shoals's possessions, youth said that he "saw [Shoals] in the window while we were dropping off his clothes," and that "[Shoals] was like, really dark in his window. He was just looking out, like kind of peeking through the curtains."
Arms's testimony corroborated the fact that Shoals was at his residence where Arms and youth left Shoals's belongings during their final trip. Arms also testified that he and youth did not stray from the direct route between Shoals's and youth's residences, that youth did not want to run into Shoals because Shoals was drunk, and that Arms actually talked to Shoals during this final trip to return Shoals's belongings. Youth's testimony that he had ample opportunity to take revenge if he had intended to do so is further corroborated by youth's girlfriend and by Officer Rademacher, who acknowledged that youth and Arms told them that they had seen Shoals at his house after the assaults.
In light of the above evidence, we are unable to say that youth's statements made at the adjudication hearing were "just as incriminating" as his statements made to Fresh during the custodial interrogation. During the custodial interrogation, youth told Fresh that he "got a baseball bat from inside the apartment and went outside and was looking for" Shoals. (Emphasis added.) While a factfinder could draw the inference that youth carried the baseball bat with him with the intent to assault Shoals from evidence other than the custodial statements, the most probative evidence of youth's alleged unlawful intent are his statements to Fresh. Accordingly, because the custodial statements provide more damaging evidence of intent than any of youth's testimony at the adjudicatory hearing, youth's hearing testimony was not "just as incriminating" as were his custodial statements. Consequently, we conclude, contrary to the state's argument, that the rule of Cook does not control. Because the state does not assert any other ground on appeal for the admission of youth's custodial statements, we conclude that they are inadmissible as evidence and that their admission was prejudicial error.
In the ordinary case, we would conduct a de novo review of the record after our evidentiary ruling, to determine whether the youth committed the acts alleged. ORS 419A.200(5). Here, however, if we review the record before us without the evidence of the custodial statements, we will be reviewing a record that may have been different if the trial court had ruled correctly on youth's motion. We do not know what evidence the parties would have presented or not presented in light of a correct ruling on the motion to suppress. Consequently, we conclude that fairness to both parties requires a remand in this case so that they can make a record that is unaffected by the error in admitting youth's involuntary statements.
Reversed and remanded.
NOTES
[1] In Walton, the defendant sought to suppress statements that constituted a denial of his name, a denial that he knew an accomplice, and his assertion of a false name. After the defendant had been given his Miranda warnings, he made statements acknowledging his true name and admitting that he knew the accomplice. Because the post-Miranda statements established the same facts as the statements he sought to suppress, any admission of those statements was harmless. Walton, 311 Or. at 231, 809 P.2d 81.
[2] Youth makes no assertion that he took the witness stand involuntarily or only in response to the adverse ruling on his motion, so we do not parse out any portions of his testimony that may have been compelled by the need to explain the evidence that resulted from the court's prehearing ruling.