178 P.3d 318 (2008)
218 Or. App. 131
In the Matter of S.P., a Youth.
STATE ex rel. JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, Respondent,
v.
S.P., Appellant.
2004812301, A129435.
Court of Appeals of Oregon.
Submitted on Record and Briefs September 18, 2007.
Decided February 20, 2008.
*319 Karen S. Torry, Portland, filed the brief for appellant.
Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Janet A. Metcalf, Assistant Attorney General, filed the brief for respondent.
Before HASELTON, Presiding Judge, and BREWER, Chief Judge, and ARMSTRONG, Judge.
HASELTON, P.J.
Youth was found to be within the jurisdiction of the juvenile court for committing acts that, if committed by an adult, would constitute first-degree sexual abuse, ORS 163.427, and first-degree sodomy, ORS 163.405. On appeal, youth argues that the juvenile court improperly admitted into evidence certain hearsay statements made by the three-year-old complainant, N, in violation of OEC 803(4), OEC 803(18a)(b), and the Sixth Amendment to the United States Constitution, as interpreted in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As explained below, we conclude that, under Crawford, the juvenile court erred in admitting testimony recounting statements that N made during an interview conducted by staff at the CARES[1] Northwest program, in which he described the alleged abuse. On de novo review, we conclude that (1) notwithstanding that error, the properly admitted evidence in the record establishes, beyond a reasonable doubt, that youth engaged in conduct that, if committed by an adult, would constitute first-degree sexual abuse; but (2) that error compels reversal and remand with respect to the sodomy-related allegations of the delinquency petition. We therefore reverse in part and remand.
We review the facts de novo and the legal issues as a matter of law. ORS 419A.200(6). On June 10, 2004, the then three-year-old victim, N, was visiting his grandmother's house, while youth, who was 13, also was visiting the house. N and youth were together watching television in a bedroom while the adults were in another room. That evening, as his parents were putting him to bed, N said that youth had touched his penis and that he did not "want to bite [youth's] penis." When his father asked N to show him where youth had touched N, N put his hand down the front of his diaper, touching his penis.
N's father called the Department of Human Services (DHS) for advice and was told not to question N but, instead, to take N to his pediatrician "for a referral to CARES Northwest." The following day, N's mother took N first to his regular pediatrician's office, but N did not make any statements to the pediatrician about being touched. The pediatrician advised N's mother to schedule an evaluation with CARES.
Mother contacted CARES and recounted to a CARES intake worker what N had reported. The intake worker at CARES also spoke with a DHS representative, McCarthy, who indicated that she would fax a report to CARES and would cross-report the matter to the Multnomah County Child Abuse Team. CARES then convened a team staffing and discussed the case. The resulting intake summary indicated that, because N had not revealed any abuse when examined by his pediatrician and "because DHS needs clarification *320 of the allegations," N "could be evaluated at CARES NW." The intake worker then contacted N's mother and, due to a cancellation, was able to schedule an evaluation for the same day. The intake worker also called DHS to confirm that McCarthy would attend the evaluation.
The evaluation at CARES was attended by McCarthy and another DHS worker, as well as Clackamas County Sheriff's Deputy Krummenacker, who was present "as a courtesy to the Portland Police Bureau." The DHS workers had another meeting scheduled and did not stay for the full evaluation, but Deputy Krummenacker remained throughout, monitoring the initial taking of information through a one-way mirror, and listening by microphone to the subsequent physical examination and interview of N.
N was examined by Dr. Heiferman, a pediatrician, and interviewed by Findlay, a social worker. Because of N's age, both the exam and the interview were conducted in an exam room.[2] Heiferman conducted a "head to toe" physical exam of N and found his physical condition to be normal. She also interviewed N, doing what she referred to as a "body review," which involved asking him if anyone had hurt various parts of his body, such as his eye, his throat, his neck, and his belly. He responded "no" to those questions. When asked if anyone had touched his penis or buttocks, he also answered "no." When asked if his mom was worried about him, he answered "no" again.
When N continued to respond with many "no" answers to various questions about his home and friends, in what Heiferman considered to be "patterned responses," Findlay took over the questioning, in order to help break the pattern. Findlay told N that N's mother had told Findlay that she was worried that someone had touched his penis, and asked N if anyone had done that. N responded that youth "already did" and that youth "was trying to suck it" with "his mouth." When asked if youth had sucked it, N responded "yes." N further indicated to Findlay that youth had grabbed N's crotch.[3] At that point, N asked for his mother, and the interview ended.
After the interview, the CARES evaluation team met to discuss the case. Deputy Krummenacker was a member of the team but did not participate in making treatment recommendations. Heiferman's diagnosis was "highly concerned for sexual abuse." After that meeting, N's mother was provided with an evaluation summary. N's mother then was joined by Deputy Krummenacker "to discuss the ongoing investigation." The CARES evaluation team recommended no further contact between N and youth, as well as monitoring N's behavior, but the team did not recommend therapy at that time, given N's young age. The evaluation summary further indicated that the team "recommend[ed] further investigation by DHS and law enforcement into these allegations of abuse."
Detectives assigned to the Multnomah County Child Abuse Team, who received the CARES evaluation report, subsequently interviewed youth. Youth, after initially denying any sexual contact with N, ultimately admitted both to intentionally touching N's penis out of sexual curiosity and to sucking on N's penis.
The present delinquency proceeding ensued. At the outset, the parties stipulated that N was unavailable as a witness. The state indicated that it intended to introduce testimony recounting N's statements during the CARES interview pursuant to either, or both, OEC 803(4), the "medical diagnosis or treatment" hearsay exception,[4] and OEC *321 803(18a)(b).[5] The state further asserted that testimony recounting N's statements to his parents describing the alleged abuse was also admissible pursuant to OEC 803(18a)(b). Youth objected on the grounds that (1) the testimony recounting N's statements either during the CARES interview or to his parents was inadmissible under the Oregon Evidence Code and (2), alternatively, citing Crawford, hearsay recounting of N's statements during the CARES interview would violate the Confrontation Clause of the Sixth Amendment to the United States Constitution.
The juvenile court concluded that testimony recounting N's statements to his parents was admissible under OEC 803(18a)(b). The juvenile court further concluded, with respect to testimony recounting N's statement during the CARES interview, that, although Crawford precluded testimony recounting that N had identified youth as the perpetrator, testimony recounting the balance of N's statements during that interview was admissible under Crawford and, as a statutory matter, under either OEC 803(4) or OEC 803(18a)(b). After the presentation of evidence, the juvenile court determined youth to be within the jurisdiction of the court for acts that, if committed by an adult, would constitute first-degree sodomy and first-degree sexual abuse.
On appeal, youth advances three arguments.[6] First, he contends that testimony recounting N's statements to his parents describing the alleged abuse was not admissible under OEC 803(18a)(b). Second, he asserts that testimony recounting N's statements during the CARES interview was not admissible under either OEC 803(4) or OEC 803(18a)(b). Third, youth contends that, even if his statutorily based objections to the admissibility of N's statements during the CARES interview are unavailing, those statements were "testimonial hearsay" under Crawford and their admission violated his constitutional confrontation rights. As amplified below, we reject youth's statutorily based objections but agree that, under Crawford, the juvenile court erred in admitting testimony recounting N's statements made during the CARES interview.
Youth's first argument, pertaining to the admissibility of testimony recounting N's statements to his parents, is based on OEC 803(18a)(b). That statute provides, in part:
"A statement made by a person concerning an act of abuse * * * is not excluded by [OEC 802] if the declarant either testifies at the proceeding and is subject to cross-examination, or is unavailable as a witness but was chronologically or mentally under 12 years of age when the statement was made * * *. However, if a declarant is unavailable, the statement may be admitted in evidence only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability, and in a criminal trial that there is corroborative evidence of the act of abuse and of the alleged perpetrator's opportunity to participate in the conduct and that the statement possesses indicia of reliability as is constitutionally required to be admitted. * * * For purposes of this paragraph, in addition to those situations described in [OEC 804(1)], the declarant shall be considered `unavailable' if the declarant has a substantial lack of memory of the subject matter of the statement, is presently incompetent to testify, is unable to communicate about the abuse or sexual conduct because of fear or other similar reason or is substantially likely, as established by expert testimony, to suffer lasting severe emotional trauma from testifying. Unless otherwise agreed by the parties, the court shall examine the declarant in chambers and on the record or outside the presence of the jury and on the record. The examination *322 shall be conducted immediately prior to the commencement of the trial in the presence of the attorney and the legal guardian or other suitable person as designated by the court. If the declarant is found to be unavailable, the court shall then determine the admissibility of the evidence."
(Emphasis added.) Youth argues, principally, that, notwithstanding the parties' stipulation that N was "unavailable" to testify, the juvenile court erred in accepting that stipulationindeed, the court was precluded from doing sowithout making an independent assessment and determination of N's availability. As support for that proposition, youth invokes State v. Campbell, 299 Or. 633, 705 P.2d 694 (1985).[7]
The state responds first by emphasizing that youth's present Campbell-based objection was unpreservedafter all, youth stipulated to N's unavailabilityand partakes of "invited error." The state further argues that any departure from Campbell here cannot be deemed an "error of law apparent on the face of the record," ORAP 5.45(1), because, for a variety of reasons, the alleged error here is "reasonably in dispute." State v. Brown, 310 Or. 347, 355, 800 P.2d 259 (1990). Specifically, the state points to differences in statutory language, the nature of youth's constitutional claims, and changes in Sixth Amendment jurisprudence since Campbell was decided. For the reasons that follow, we conclude that, in light of changes in the law since Campbell, the alleged error in this case does not qualify as "plain error."
We begin with Campbell. There, the defendant was convicted of first-degree sodomy of a three-year-old victim. 299 Or. at 635, 705 P.2d 694. After the parties stipulated that the victim was not competent to testify, her mother was permitted to recount the victim's statements to her describing the abuse. Id. at 635, 705 P.2d 694.
On appeal, the Supreme Court considered, in part, whether that testimony was admissible under the then-extant version of OEC 803(18a), which provided that "`[a] complaint of sexual misconduct made by the prosecuting witness after the commission of the alleged offense'" was not excluded by OEC 802.[8]Campbell, 299 Or. at 640, 705 P.2d 694. Specifically, the court addressed whether a child victim needed to testify in order for her out-of-court statements to be admitted under that rule. Id. at 640-53, 705 P.2d 694. After reviewing the history of that provision, which codified case law that predated the Oregon Evidence Code, the court concluded that, "[a]lthough one of the reasons for the rule as expressed by this court would logically require the adult victim to testify in order to have her testimony corroborated by her out-of-court complaint, such rationale is not applicable in the case of a child victim." Id. at 644-45, 705 P.2d 694.
The Supreme Court proceeded to consider whether admission of the child's hearsay statements if the child did not testify would violate the confrontation rights guarantee in Article I, section 11, of the Oregon Constitution. It concluded that, although it interpreted Article I, section 11, independently from similar provisions of the United States Constitution, it would adopt as persuasive the reasoning from the United States Supreme Court's decision in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), concerning the admissibility of children's hearsay statements. Campbell, 299 Or. at 648, 705 P.2d 694. As pertinent here, the court held that Article I, section 11, required a determination that the declarant was unavailable. Id. The court in Campbell went on to conclude:
"We believe that the question of unavailability of a hearsay declarant supposedly due to incompetency should not be left to the advocates in a criminal trial. The prosecution would be relieved from calling the witness and the defense relieved from having the witness appear for trial. If the court is going to admit hearsay statements against a defendant to satisfy the confrontation *323 rights of an accused, the court must ensure the declarant is in fact unavailable. * * *
"* * * We hold, therefore, that before any out-of-court declaration of any available living witness may be offered against a defendant in a criminal trial, the witness must be produced and declared incompetent by the court to satisfy either Article I, section 11, of the Oregon Constitution, or the Sixth Amendment to the United States Constitution."
Id. at 651-52, 705 P.2d 694 (omitted).
The Supreme Court consequently reversed and remanded for the trial court to make an independent determination of whether the child victim was incompetent and, hence, unavailable to testify. Id. at 652, 705 P.2d 694. The court said nothing about the potential procedural implications of the defendant's agreement to the stipulation, e.g., waiver, nonpreservation, or "invited error."
More than 20 years have passed since Campbell. During that time, the Oregon Supreme Court, while acknowledging that subsequent case law from the United States Supreme Court indicates that the Sixth Amendment does not necessarily require the showing of unavailability described in Campbell, has reaffirmed its conclusion that Article I, section 11, does require such a showing. State v. Moore, 334 Or. 328, 49 P.3d 785 (2002). Further, in Crawford, the United States Supreme Court abandoned the Confrontation Clause test from Ohio v. Roberts on which Campbell was predicated. See generally State v. Mack, 337 Or. 586, 590, 101 P.3d 349 (2004) (Crawford "announced a different Confrontation Clause analysis than [that] announced in Roberts").[9]
Several features of Campbell are salient in juxtaposition to this case and youth's unpreserved claim of error. First, unlike Campbell, where the court's analysis and holding were based on the Confrontation Clause of Article I, section 11, youth's contention here is purely statutory, viz., that OEC 803(18a)(b) does not, by its terms, permit the admission of hearsay even if the parties have stipulated to the child declarant's unavailability. Second, language in OEC 803(18a)(b), which was enacted after Campbell,[10] at least suggests that the parties' stipulation is to be given effect. Specifically, OEC 803(18a)(b) provides that, "[u]nless otherwise agreed by the parties, the court shall examine the declarant in chambers and on the record or outside the presence of the jury and on the record." (Emphasis added.) Third, as noted, Campbellwhich antedated both Brown and Ailes v. Portland Meadows, Inc., 312 Or. 376, 823 P.2d 956 (1991)did not address preservation of error, much less waiver or "invited error." Fourth, although Campbell implicitly rests on a premise that constitutional confrontation protections cannot be waived, subsequent decisions of the Oregon Supreme Court appear to contradict that premise, recognizing that criminal defendants routinely waive trial-related constitutional rights for a variety of tactical and strategic reasons. See generally Kitzman, 323 Or. at 615, 920 P.2d 134 (Van Hoomissen, *324 J., concurring). Indeed, the Supreme Court has admonished against "plain error" review in circumstances in which a criminal defendant's failure to raise a constitutional objection may have been the product of such considerations. See, e.g., State v. Fults, 343 Or. 515, 523, 173 P.3d 822 (2007) (setting out factors pertinent to exercise of discretion to review unpreserved error, including possibility that a defendant may choose for tactical reasons not to assert a constitutional protection); State v. Raney, 217 Or.App. 470, 175 P.3d 1024 (2008) (refusing to consider unpreserved constitutional challenge to the admission of the results of a laboratory report where there were competing inferences as to whether the defendant's failure to object under Article I, section 11, to the admission of that report was the product of a conscious tactical or strategic choice).
Our point is not, of course, that Campbell is no longer good law. "We are not in the business of overruling decisions of the Oregon Supreme Court." Schiffer v. United Grocers, Inc., 143 Or.App. 276, 284, 922 P.2d 703 (1996), rev'd on other grounds, 329 Or. 86, 989 P.2d 10 (1999). Rather, the foregoing observations compel two conclusions, either of which is dispositive. First, the juvenile court's acceptance of the parties' stipulation as to N's unavailability does not satisfy the requisites of plain error because Campbell's proper application in these circumstances is not "obvious" but is, instead, "reasonably in dispute." Brown, 310 Or. at 355, 800 P.2d 259. Further, in all events, the manifest potential that the stipulation was the product of a tactical or strategic choice decisively militates against an exercise of Ailes discretion. Accordingly, we affirm the juvenile court's admission of the testimony recounting N's statements to his parents describing the alleged abuse.
We proceed, then, to youth's statutorily based challenge to the admission of testimony recounting N's statements during the CARES interview. As noted, the juvenile court concluded that that testimony was admissible under either OEC 803(4) or OEC 803(18a)(b). Youth's arguments with respect to the inapplicability of OEC 803(18a)(b) in this context are identical to those that we rejected immediately above and, thus, fail for the same reasons. Accordingly, we need not determine whether the challenged testimony was independently admissible under OEC 803(4).[11]
We proceed, finally, to youth's contention that the constitutional principles enunciated in Crawford precluded the admission of testimony recounting N's statements during the CARES interview. In particular, defendant contends that Crawford, as well as the Oregon Supreme Court's application of Crawford in Mack, compel a conclusion that N's hearsay statements were "testimonial" and were not admissible into evidence because defendant did not have an opportunity to cross-examine N.
The state responds that N's statements were not "testimonial" as that term has been used in Crawford and later cases. In particular, the state asserts that, in determining whether a statement is "testimonial" for Crawford purposes, "it cannot be the expectation or purpose of the questioner that controls" the analysis; instead, "the declarant's purpose or expectation is significant." The state also argues that, because N's statements were not elicited by a police officer or other government agent, they are not testimonial.
The parties fully appreciateas do we that the determination of whether, or in what circumstances, a child complainant's statements made during a CARES interview will be deemed to be "testimonial" may have profound implications for the investigation and prosecution of child sex abuse cases in this state. In Mack, the Oregon Supreme Court addressed some aspects of Crawford's application in this context, as have we in at least two cases in which the Crawford-based objection was not raised in the trial court. See State v. Foreman, 212 Or.App. 109, 157 *325 P.3d 228, rev. den., 343 Or. 223, 168 P.3d 1154 (2007); State v. Pitt (A120428), 209 Or.App. 270, 147 P.3d 940 (2006), adh'd to on recons., 212 Or.App. 523, 159 P.3d 329 (2007). But the dispute here, in which the question was fully preserved, appears to be more broadly drawn and comprehensively joined than in those cases.
We begin with Crawford. There, the Court abandoned its longstanding formulation, as expressed in Ohio v. Roberts, that, in most circumstances, the Sixth Amendment did not preclude the admission of hearsay statements by unavailable witnesses if those statements were found to have sufficient "indicia of reliability." Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. 2531. Instead, Crawford announced a rule that the Sixth Amendment prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354 (emphasis added). Although the Court did not attempt to define the universe of "testimonial statements," it identified a number of types of statements, such as pretrial affidavits that declarants would reasonably expect to be used in a prosecution and statements taken by police officers during interrogations, including statements of a child victim to an investigating police officer. Id. at 51-52, 58 n. 8, 124 S.Ct. 1354.
In subsequent consolidated cases, Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (Davis/Hammon), the Court considered whether certain hearsay statements made by a victim to a 9-1-1 operator (Davis) and certain hearsay statements made by a victim after police responded to a report of domestic disturbance (Hammon) were admissible. The Court concluded:
"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."
547 U.S. at 822, 126 S.Ct. at 2273-74 (omitted). That summary indicates that, at least when the statements in question are the result of police interrogation, the Court was looking to the purpose of the interrogator in asking the questions rather than the purpose of the declarant in making the statements. However, the Court's further, particularized observations about the circumstances in Davis/Hammon suggest that the inquiry is not so straightforward as simply discerning the intent of the questioner.
For example, with respect to the Davis portion of the case, the Court noted that the 9-1-1 caller (McCottry) was reporting events as they actually were happening, rather than describing past events, and she was facing an ongoing emergency: "Although one might call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat." 547 U.S. at 827, 126 S.Ct. at 2276 (emphasis in original). That observation proceeds from the declarant/caller's perspective. However, the immediately following statement reverts to a focus on the questioner: "[T]he nature of what was asked and answered * * * was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past." Id. Finally, the Court referred to both the declarant's and the questioner's circumstances in comparing the circumstances in Davis/Hammon with those in Crawford:
"[The victim in Crawford] was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe."
Davis/Hammon, 547 U.S. at 827, 126 S.Ct. at 2277.
*326 Turning to the Hammon portion of the case, the Court concluded that statements made by a victim to officers responding to a domestic disturbance call were testimonial, much as were the statements at issue in Crawford:
"Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial."
Davis/Hammon, 547 U.S. at 830, 126 S.Ct. at 2278 (omitted; emphasis in original).
The totality of the Court's discussion in Davis/Hammon thus indicates that while (1) the purpose of the questioner in eliciting statements is a key focus of the inquiry, particularly in cases involving police interrogations, (2) in some circumstances, the declarant's reasons for making a statement may also be relevant to determining whether a statement should be treated as testimonial for purposes of Sixth Amendment analysis.
That conclusion comports with the analysis employed by the Oregon Supreme Court in Mack, which was decided before Davis/Hammon. In Mack, a four-year-old child, Shaydon, had witnessed the defendant's assault on his brother. After a police officer tried to interview Shaydon but was unable to establish rapport, the police sought the assistance of Snyder, a DHS social worker, in conducting the interview. 337 Or. at 588, 101 P.3d 349. The police videotaped Snyder's interviews of Shaydon, during which he described what the defendant had done to his brother. The trial court ruled that, although the statements would be admissible under OEC 803(18a)(b), they were "testimonial" and, thus, inadmissible under Crawford. Mack, 337 Or. at 589, 101 P.3d 349. The Oregon Supreme Court agreed:
"We need not go beyond the reasoning in Crawford to decide this case. Shaydon's statements to Snyder fell within the core class of testimonial evidence that Crawford identified. There can be little doubt that, if the police officers had conducted these interviews with Shaydon, the resulting statements would be testimonial. Indeed, Crawford described an officer's interview of the four-year-old victim in White v. Illinois, 502 U.S. 346, 349-51, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), as eliciting testimonial evidence. 124 S.Ct. at 1368 n. 8. The only difference between this case and White is that a DHS worker, rather than an officer, conducted the interviews. The DHS worker, however, was serving as a proxy for the police. She took over the first interview when the interviewing officer was unable to establish a dialogue with Shaydon. She continued in that role in the second interview and elicited statements from Shaydon so that police officers could videotape them for use in a criminal proceeding. Under Crawford, admitting Shaydon's statements to Snyder would violate the Confrontation Clause."
Mack, 337 Or. at 593, 101 P.3d 349 (omitted).
In so concluding, the Supreme Court emphasized that not only were the interviews taped, but also that Snyder conducted the interview "in an age-appropriate way to elicit information from Shaydon relevant to the police investigation." Id. at 594, 101 P.3d 349. In response to the state's suggestion (similar to the argument the state makes here) that the focus must be on the child's intent in making the statements, the court acknowledged that there may be situations in which the declarant's purpose in making a statement might bear on whether it was testimoniale.g., "unsolicited statements" or "[e]mergency calls to government officials." Id. Nevertheless, "[t]he primary focus in Crawford was on the method by which government officials elicited out-of-court statements for use in criminal trials, not on the declarant's intent or purpose in making the statement." Id.[12]
*327 Most recently, in Pitt, we addressed whether statements made by a child victim during a forensic interview conducted at a child advocacy center were testimonial for purposes of the Sixth Amendment. We concluded that they were. Because Pitt is closely analogous to this case in several respects, we describe it in some detail.
In Pitt, a four-year-old child revealed to her mother that the defendant had touched her genital area. The mother called the police, who arranged for the child to be examined by a physician, who diagnosed sexual abuse. The physician made a referral to a psychologist for the child to receive counseling, and the child revealed to the counselor some details of the abuse. 209 Or.App. at 272-73, 147 P.3d 940. Approximately six months later, the child was taken to the Lane County Advocacy Center, where a forensic child interviewer interviewed her about the abuse. The interview was taped. Id. at 273, 147 P.3d 940. Ultimately, after the child was found to be unavailable as a witness, the videotape was admitted into evidence against the defendant. Although the defendant did not preserve a Crawford-based objection to the admission of that evidence, he argued on appeal that the trial court had committed "plain error." We agreed.
In so holding, we emphasized that the child advocacy center, a private nonprofit organization, was "in partnership with the district attorney's office and provid[ed] a number of services related to child abuse investigation," including interviewing, medical examinations, and referrals to mental health treatment. The program also housed a grand jury. Id. at 273, 147 P.3d 940. The director of the program, who interviewed the child, described his role as to "`coordinate interview participation among law enforcement, child protection services and prosecutors.'" Id.
Given those circumstances, relying on Mack, we concluded that the statements the child made in the video were testimonial:
"Although, as in Mack, the interviews were not conducted by a police officer, they were conducted for the express purpose of furthering a police investigation, with a police officer recording them and with the interviewer explicitly attempting to solicit information from the children that would be useful for defendant's prosecution."
Pitt, 209 Or.App. at 279, 147 P.3d 940. We further emphasized, citing Davis/Hammon, that the "primary purpose" of the videotaped interview was to "`establish or prove past events potentially relevant to later criminal prosecution.'" Id. (quoting Davis/Hammon, 547 U.S. at 821, 126 S.Ct. at 2273).[13]
The disposition of the Crawford-based challenge in this case thus turns on whether, for Sixth Amendment purposes, the circumstances of N's interview at the CARES program were so materially different from those in Mack and Pitt as to warrant a different result.
The state contends that Mack is so distinguishable because the DHS worker/interviewer in that case was acting directly as "a proxy for" and "an agent for" the police, Mack, 337 Or. at 593, 594, 101 P.3d 349, and the record here does not substantiate such a relationship between Heiferman and Findlay, who conducted the interview, and law enforcement or prosecutorial personnel. The state further contends that Pitt is also decisively distinguishable because of a combination of circumstances that are not present here, including that the child advocacy center there operated "in partnership with" the prosecutor's office, Pitt, 209 Or.App. at 273, 147 P.3d 940, and in the same facility where a grand jury met and that police officers videotaped the interviews there. The state asserts that, in comparison, there was a *328 "minimal degree of police involvement here." The state further, and fundamentally, contends that, viewed either from the interviewer's perspective or N's perspective, the "primary purpose" of the interview was "medical, not investigatory or prosecutorial." In that regard, the state posits that, regardless of any involvement by police or prosecutorial personnel, a careful medical professional would have asked the same questions of N and, presumably, have elicited the same responses: "Exactly the same medical exam and interview would have taken place if the deputy had not been present and exactly the same medical report would have been generated."
We understand the state, in sum, to advance a somewhat nuanced, multifactored analysis in which the determination of whether statements are "testimonial" for Crawford purposes depends not only on the questioner's "primary purpose," or even on some assessment of both the questioner's and the declarant's "primary purposes," but also on the quality and degree of police or prosecutorial involvement in any interview or evaluation that produces those statements.
We agree with the state that, almost invariably, the determination of whether an unavailable declarant's statements, which were given in response to questioning, are "testimonial" will depend on a variety of considerationsand not solely on an assessment of the questioner's "primary purpose." In particular, where an interview or evaluation process serves multiple purposes, the nature and extent of police or prosecutorial involvement in that process is a very substantialindeed, potentially decisiveconsideration. See, e.g., Pitt, 209 Or.App. 270, 147 P.3d 940. In this case, as in Pitt, that consideration is decisive. Although, as the state points out, there are some circumstantial differences between the two cases with respect to law enforcement involvement in the evaluation process, those differences are, as we will explain, ultimately immaterial. Consequently, we conclude that N's statements during the CARES interview were testimonial.
We begin with a description of the CARES program, as substantiated on this record. CARES is a program that provides a medical setting for the diagnosis of child abuse. It contains interview rooms where children are interviewed, which are equipped with one-way mirrors so that the interviews may be videotaped or observed by law enforcement and DHS personnel. Adjacent examination rooms contain microphones so that law enforcement and DHS personnel may listen on headphones during the physical examination. After conducting interviews and examinations, CARES makes referrals for treatment to various care providers in light of the results of its evaluationsthat is, CARES does not itself provide treatment.
CARES operates in conjunction with DHS and law enforcement officials, and receives the majority of its referrals from those sources. As the trial court noted:
"[A] goal of CARES is to centralize the interview process to minimize the likelihood of contamination to a child's statements. In other words, CARES is supposed to substitute for the multiple interviews that may result from a child abuse investigation that could include medical, law enforcement and child welfare workers talking with the child at various points in criminal investigations, juvenile dependency, civil custody proceedings and/or criminal prosecutions."[14]
Heiferman testified that CARES interviewers are trained to gather information from children and that their training is beyond what a general pediatrician would be expected to have. She testified that, in the majority of cases, law enforcement and DHS personnel observe CARES interviews. Heiferman explained that police are routinely present during the CARES process because "it's a safety issue for the child." She elaborated:
"When we make recommendations and in terms of history taking, the information about the offender is important in terms of the contact that the child is going to have *329 with the person and when this is going to be a safe environment."
Heiferman further testified that the results of CARES evaluations are routinely provided to law enforcement personnel. In contrast, a child's parents are not given a copy of the full CARES evaluation report but are, instead, provided only with "an abbreviated form."
Findlay, the social worker who participated in N's interview, testified that, although the evaluation process may vary somewhat depending on the age of the child involved and the nature of the suspected abuse, CARES uses a standard protocol regardless of the source of the referral. There is no evidence in this record that law enforcement personnel participated in the development of CARES' standard protocol. Findlay confirmed that "it's very common" for law enforcement personnel to monitor CARES evaluations. He explained:
"[O]ne of the primary goals of CARES is to * * * centralize the evaluation process when there is a concern of abuse so that law enforcement and DHS, other sort of members of the community that are also going to be involved in the sort of evaluation investigative process will be there present to hear firsthand what the child says, so that if they have specific questions from what a child has said, they were there, they heard it.
"They may not have to, say, reinterview the child themselves. * * *
"* * * * *
"* * * [T]here is oftentimes where an officer might be listening to an exam in which maybe there's a detective that's assigned or they're deciding whether or not a case has merit to be assigned to a detective at a later date."
With that background, we return to the circumstances of N's referral and evaluation by CARES. After N disclosed the alleged abuse to his parents, his father called DHS' Child Protective Services "hotline" for advice. He was directed by DHS to "go to our pediatrician and then get in contact with CARES." N's mother took him to his pediatrician the next day, and the pediatrician conducted a physical examination but did not question N about the abuse; instead, consistently with DHS' instructions, he referred N to CARES.
The CARES intake summary noted that, before CARES agreed to undertake the evaluation, CARES personnel consulted with DHS, which provided CARES with its initial screening report. CARES subsequently agreed to undertake the evaluation "because DHS needs clarification of the allegations."
As noted, Deputy Krummenacker was present, but not visible, during the interview. Deputy Krummenacker had no input into the questions that were asked. After the interview was concluded, when members of the evaluation team met to render treatment recommendations, Deputy Krummenacker joined them but "didn't participate in the treatment recommendations[.]"
After the evaluation team had agreed on its treatment recommendations, members of the team then met in the interview room with N's mother, who had accompanied him to the CARES facility, and provided her with a summary of their findings and an explanation of their treatment recommendations. Immediately thereafter, Deputy Krummenacker met with N's mother in the CARES facility's interview room "to discuss the ongoing investigation."
Heiferman and Findlay later generated a comprehensive written report. Among that report's "treatment recommendations" was the following:
"Based on the information available to us today, we recommend further investigation by DHS and law enforcement into these allegations of abuse."
As noted, under CARES protocols, CARES evaluation reports are "routinely referred to law enforcement." Here, the lead detective on the case received a copy of the CARES report and reviewed that report before ever speaking with youth. Later, as the detective interviewed youth, he used N's statements as recounted in the report to contradict youth's initial denials.
The record in this case pertaining to CARES generally, and this evaluation particularly, compels two conclusions. First, the *330 CARES interview process serves multiple concurrent purposes. To be sure, one of those purposes is to obtain an accurate diagnosis of whether a child has, in fact, been sexually abusedwhich, in turn, will promote effective medical and psychological treatment (albeit not by CARES itself). But CARES also functions as an informational clearinghouse for police and child welfare authorities, so that they can deal effectively with perpetrators of child sex abuse. As the juvenile court recognized, the CARES process is designed to "minimize the likelihood of contamination" of a child's statements from suggestive questioning techniques or multiple interviews by different questionersand, thus, to provide not only treatment providers but also law enforcement authorities with the cleanest, most credible evidence of abuse.
That purpose is laudable. And that purpose is not problematic, except in cases (like this) where the state seeks to rely at trial on a child's statements during a CARES interview and the child is not "available"and, thus, is not subject to cross-examination. Thatviz., conviction based on evidence not susceptible to cross-examinationis the constitutional vice that Crawford confronts.
The second conclusion that this record compels is that, contrary to the state's contention, the involvement of law enforcement in the CARES process is hardly "minimal." Rather, it is pervasive. It is trueas the state emphasizesthat there is no evidence that police officers or prosecutors participated in the development of the CARES protocol and that here Deputy Krummenacker had no visible presence during the interview and merely observed passively. But it is also true that not only did Deputy Krummenacker observe the entire interview (as did the officer in Pitt), but he also was present during the evaluation team's consultation and immediately thereafter met with N's mother in the CARES facility's interview room to discuss the course of the prosecution. The close connection between CARES and law enforcement authorities is further corroborated by (1) CARES' routine practice of providing police agencies with complete copies of its evaluation reports (while providing only abridged "summaries" to parents) and (2) CARES' "treatment recommendation" urging "further investigation by DHS and law enforcement into these allegations of abuse."
Those circumstances conclusively refute the state's suggestion that, as a practical matter, CARES is indistinguishable from an individual pediatrician who is subject to mandatory obligations to report suspected child abuse. The individual pediatrician does not, as a matter of routine, invite police officers to listen in on physical examinations or to observe patient interviews from behind one-way mirrors. Nor does he or she invite police officers to sit in on meetings in which treatment recommendations are formulated. Similarly, individual pediatricians generally do not send medical diagnostic reports (much less those that are far more complete than those disclosed to their patients) to law enforcement agenciesand there is no suggestion on this record that such a practice is common, or even accepted, even in situations in which mandatory reporting obligations are implicated.
One final and fundamental distinction between the individual pediatrician and CARES remains: The individual pediatrician does notor, at least, not as a routine matterseek and obtain information with the conscious concurrent purpose of preserving that information to assist possible future prosecutions. Rather, although the operation of mandatory reporting requirements may compel the communication of certain information to child welfare or law enforcement agencies, that is the consequence, not the purpose, of the individual pediatrician's inquiries.
Ultimately, on this record, CARES' purpose of developing and preserving an accurate account of alleged abuse for law enforcement authorities is inextricable from its medical diagnostic purpose. The two are concurrent and coequal; both are "primary" in the sense that neither takes precedence over the other. It may be that individual interviewers/evaluators subjectively elevate the diagnostic purpose but, institutionally, the evaluation process (including routine police observation and systematic sharing of comprehensive reports with law enforcement *331 agencies) is designed to advance both ends concurrently as part of a "holistic" interview process.[15] Thus, as in Pitt, a "primary purpose" of the interview process was to "`establish or prove past events potentially relevant to later criminal prosecution.'" Pitt, 209 Or.App. at 279, 147 P.3d 940 (quoting Davis/Hammon, 547 U.S. at 821, 126 S.Ct. at 2273).[16]
Further, and contrary to the state's assertion, N's supposed subjective purpose in making his statements during the CARES interview is largely immaterial to the determination of whether those statements are "testimonial." Putting aside the difficulties of assessing the mind of a three-year-old (much less one stipulated to be unavailable to testify at the juvenile hearing six months later "by reason of competency"),[17] the circumstances here are not of the sort "in which the declarant's purpose in making a statement" substantially "bear[s] on whether the statement is testimonial." Mack, 337 Or. at 594, 101 P.3d 349. For example, N's statements were not "unsolicited," id., but were, instead, elicited during the course of a highly structured interview. Accord Davis/Hammon, 547 U.S. at 814-17, 126 S.Ct. at 2269-70 (greater "level of formality" in the questioning process militates in favor of determination that responses are "testimonial"). Nor were those statements elicited during the course of questioning designed to address a continuing "emergency," akin to a 9-1-1 call. Id. Accord Camarena, 344 Or. at 39-40 (in determining whether, under Davis, unavailable declarant/caller's responses to 9-1-1 operator were "testimonial," court should not focus "exclusively on the nature of the questions" by the emergency operator but, instead, should also evaluate the declarant's purposes in making her statements).[18]
In sum, the preservation of evidence for purposes of future criminal investigation and potential prosecution was a concurrent "primary purpose" of the CARES interview process. Further, CARES had significant involvement with child protective services and law enforcement personnel in this case, beginning with DHS' initial indirect referral of N to CARES, and continuing through CARES' provision of its complete evaluation report  including its "treatment recommendation" that "law enforcement" engage in "further investigation * * * into these allegations of abuse"  to the Multnomah County Sheriff's Office's child abuse team. Given those circumstances, CARES was, to a substantial extent, "serving as a proxy for the police," Mack, 337 Or. at 593, 101 P.3d 349, in interviewing N. Consequently, N's statements during the CARES interview were "testimonial"  and, under Crawford, the juvenile *332 court erred in admitting those statements into evidence.
We consider, finally, the effect of that error on either or both of the bases for delinquency jurisdiction in this case. If this were a criminal case, because Crawford-based error is constitutional error, we would review to determine whether the erroneous admission of the CARES interview-related testimony was harmless beyond a reasonable doubt, see, e.g., State v. Cook, 340 Or. 530, 544, 135 P.3d 260 (2006)  and, indeed, the state urges us to engage in that sort of harmless error inquiry here. But this is not a criminal case; it is a juvenile delinquency case  a case in which we engage in de novo review. ORS 419A.200(6)(a). Specifically, we review the record de novo to determine whether the allegations of the delinquency petition have been proved beyond a reasonable doubt. ORS 419C.400(2). Given our de novo review function, the appropriate approach is not to employ the usual appellate "harmless error" construct but, instead (subject to an exception addressed below), to engage in de novo review of the record excluding the erroneously admitted testimony recounting N's statements during the CARES interview. See State ex rel Juv. Dept. v. Sauer, 189 Or.App. 78, 84, 73 P.3d 293 (2003) ("On de novo review, we will affirm the trial court's ruling despite erroneously admitted evidence only if we are convinced that the properly admitted evidence establishes the acts in the petition beyond a reasonable doubt." (Citation omitted.)).
We begin with the allegations pertaining to conduct which, if committed by an adult, would constitute first-degree sexual abuse. As noted, youth confessed to the investigating detectives that, out of sexual curiosity, he had intentionally touched N's penis. That confession was corroborated, see ORS 136.425(1), by N's statements to his parents that youth had touched his penis and by N's demonstration of that conduct to his parents. Other testimony established that youth was, indeed, alone with N at the time that the alleged abuse occurred. Youth did not persuasively dispute the state's proof. On de novo review, we determine that the record establishes, beyond a reasonable doubt, that youth did, in fact, intentionally touch N's penis and that, in the totality of the circumstances, including the nature of the relationship between youth and N, that intentional touching was "for the purpose of * * * gratifying the sexual desire of either party." ORS 163.305(6). Accordingly, we affirm the trial court's finding of jurisdiction based on conduct that, if committed by an adult, would constitute first-degree sexual abuse.
The proof of the allegation of conduct constituting first-degree sodomy is more problematic. As noted, youth confessed to the detectives that he put N's penis in his mouth. During the CARES interview, N told the interviewers that youth had tried to suck N's penis with his mouth  but, with that evidence excluded from our consideration, we must determine whether other evidence in the record sufficiently corroborates youth's confession in that regard. See ORS 136.425(1) ("[N]or is a confession only sufficient to warrant the conviction of the defendant without some other proof that the crime has been committed.").
Aside from youth's confession, the only properly admitted evidence in this record pertaining to possible sodomy is N's statement to his parents, on the evening of his encounter with youth, that "I don't want to bite [youth's] penis." That evidence is legally insufficient to corroborate the act of sodomy alleged in the delinquency petition. See generally State v. Simons, 214 Or.App. 675, 682-83,167 P.3d 476 (2007) ("To satisfy [ORS 136.425(1)], there must be independent proof of the corpus delicti, that is, that (1) the injury or harm specified in the crime occurred, and (2) that this injury or harm was caused by someone's criminal activity."). Specifically, N's statement that he did not want to bite youth's penis refers to different conduct than that described in youth's confession  viz., that youth sucked on N's penis. See State v. Fry, 180 Or.App. 237, 244, 42 P.3d 369 (2002) ("Proof that a different crime has been committed cannot satisfy that [corroboration] requirement, nor can proof of one charged crime satisfy the requirement as to a different charged crime.").
*333 The question of the proper disposition as to the sodomy-related allegations remains. If we were to proceed with our de novo review of the record with respect to those allegations in accordance with the methodology described in Sauer, we would be compelled to reverse the trial court's finding of jurisdiction based on those allegations, because the properly admitted evidence in this record does not establish the alleged acts beyond a reasonable doubt. However, Sauer itself acknowledged  and applied  a prudential exception to that approach where the "`record * * * may have been different if the trial court had ruled correctly'" on the motion to exclude the improperly admitted evidence. Sauer, 189 Or.App. at 85, 73 P.3d 293 (quoting State ex rel Juv. Dept. v. Castellano, 178 Or.App. 251, 259, 35 P.3d 1144 (2001)).
Here, although it is doubtful that the state could have, and would have, adduced other evidence corroborating youth's confession as to the sodomy-related conduct, that is by no means certain. See, e.g., Castellano, 178 Or. App. at 259, 35 P.3d 1144 ("We do not know what evidence the parties would have presented or not presented in light of a correct ruling on the motion to suppress."). Consequently, we vacate the juvenile court's finding of jurisdiction based on the allegation that youth engaged in conduct that, if committed by an adult, would constitute first-degree sodomy and, consistently with the approach in Sauer and Castellano, remand for further proceedings pertaining to that allegation.
Juvenile court's finding of jurisdiction on ground that youth had engaged in conduct that, if committed by an adult, would constitute first-degree sodomy vacated and remanded; otherwise affirmed.
NOTES
[1] The acronym originally stood for Child Abuse Response and Evaluation Services.
[2] Although CARES generally videotapes interviews with older children and has a one-way observation mirror for police and DHS workers to observe such interviews, the interview of N was not videotaped, nor was it conducted in a room with a one-way mirror.
[3] As noted below, the trial court admitted those statements into evidence but indicated that N's identification of youth as the perpetrator was not admissible.
[4] OEC 803 provides, in part:

"The following are not excluded by [OEC 802] even though the declarant is available as a witness:
"* * * * *
"(4) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
[5] The pertinent text of OEC 803(18a)(b) is set out below. 218 Or.App. at 137-38, 178 P.3d at 321-22.
[6] We have reordered defendant's arguments to accord with the first things first methodology prescribed in State v. Kennedy, 295 Or. 260, 262, 666 P.2d 1316 (1983).
[7] Youth also contends, in conclusory fashion, that the court's findings concerning "indicia of reliability" pursuant to OEC 803(18a)(b) were insufficient. We reject that argument without discussion.
[8] A very similar provision currently is codified in OEC 803(18a)(a).
[9] Campbell has also been pilloried in the last two decades, most cogently in a concurring opinion in State v. Kitzman, 323 Or. 589, 920 P.2d 134 (1996):

"Campbell * * * was wrong in holding that a trial court could not accept the parties' stipulation that the child was unavailable to testify at trial * * *:
"`Generally, I see no reason why a criminal defendant should not be permitted to stipulate to virtually anything that he or she chooses * * *. A defendant may plead guilty to the charge. Indeed, a defendant even may plead guilty to aggravated murder, which might result in a sentence of death. A defendant may waive his or her state and federal constitutional rights to counsel, trial, jury, confrontation, and cross-examination. * * * A defendant intentionally may fail to raise an otherwise valid objection at trial and, thus, waive the right to raise the issue on appeal. The parties may stipulate to facts. State v. Lyon, 304 Or. 221, 231, 744 P.2d 231 (1987). Why, then, shouldn't he or she be permitted to stipulate to other things?'"
323 Or. at 615, 920 P.2d 134 (Van Hoomissen, J., concurring) (quoting State v. Adams, 315 Or. 359, 368-69, 847 P.2d 397 (1993) (Van Hoomissen, J., concurring)) (emphasis added). Accord Kitzman, 323 Or. at 605 n. 17, 920 P.2d 134 ("[N]othing in our opinion today requires us either to apply or to reconsider this court's holding in Campbell that the parties to a criminal proceeding cannot stipulate as to a witness' unavailability.").
[10] See Or. Laws 1989, ch. 881, § 1.
[11] We thus decline defendant's invitation to revisit our holding in State v. Logan, 105 Or.App. 556, 806 P.2d 137, rev. dismissed, 312 Or. 16, 815 P.2d 703 (1991) (affirming admission of four-year-old child declarant's statements made during sex abuse evaluation because evidence was sufficient to support determination that child understood the nature of the examination and, thus, her "answers were motivated by desire for medical diagnosis or treatment").
[12] Very recently, the Oregon Supreme Court specifically addressed the application of Davis in the context of statements made to 9-1-1 operators. In State v. Camarena, 344 Or. 28, 176 P.3d 380 (2008), the court, noting that "the issue on review is narrowstatements to a 9-1-1 operator," held that, under Davis, "statements made in situations not amounting to `interrogation' may, depending on the circumstances, nevertheless qualify as testimonial." Camarena, 344 Or. at 36, 40. Camarena, presumably because of the particular context in which it arose, does not refer to Mack.
[13] In Foreman, we declined to address, as error apparent on the face of the record, an unpreserved claim that the trial court had erred under Crawford in permitting a pediatrician at a "child victim assessment center" to recount statements that the three-year-old complainant had made during the course of an examination. See 212 Or.App. at 112-13, 157 P.3d 228. We so concluded because the record in Foreman did not "reflect facts such as those that were established in Pitt" and, thus, it was not "beyond dispute that [the child's] statements * * * were testimonial." Id. at 117, 157 P.3d 228.
[14] The record here does not disclose whether, or to what extent, public agencies provide financial support to CARES.
[15] Indeed, those purposes may well be mutually reenforcing. Accurate diagnosis can enhance effective prosecution, and effective prosecution of perpetrators protects child victims and can promote their treatment and recovery.
[16] The fact that, unlike the officer in Pitt, Deputy Krummenacker did not videotape N's interview here is a distinction that makes no difference. The record discloses that, as a matter of routine practice, CARES does videotape interviews of children over the age of four. In all events, videotaping the interview or observing the interview and later recounting it are merely different methods by which a child's hearsay statements can be presented to a factfinder at trial.
[17] But see Logan, 105 Or.App. 556, 806 P.2d 137.
[18] In Camarena, the Supreme Court explained that, in some contexts, even "statements made in situations not amounting to `interrogation' may, depending on the circumstances, nevertheless qualify as testimonial." 344 Or. at 40, 176 P.3d 380. Consequently, the court focused on whether the statements related to an ongoing (or at least temporally proximate) emergency, whether the statements were necessary to help terminate that emergency, and the environment in which the statements were made. Id. The court concluded that some of the statements that addressed the emergency were nontestimonial, but that, "[v]iewed objectively, the remaining questions and responses were directed at establishing facts only relevant to a subsequent criminal action." Id.

We understand Camarena to stand for the proposition that, in the circumstances at issue there, the objective assessment of the circumstances may call for more emphasis to be placed on the declarant's purposes than on the purpose of the questioner. Nothing in Camarena purports to disavow the holding in Mack that, in the circumstance of a young child being interrogated about suspected abuse, the focus is "on the method by which governmental officials elicited out-of-court statements for the use in criminal trials, not on the declarant's intent[.]" Mack, 337 Or. at 594, 101 P.3d 349.