Argued and submitted May 11, 2007, reversed and remanded March 19, 2008

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# ALAN DUANE NORBY,
*Defendant-Appellant.*

Washington County Circuit Court
C032763CR; A125429

180 P3d 752

Rebecca E. Duncan, Chief Deputy Public Defender, argued the cause for appellant. With her on the briefs were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

In this criminal case, defendant was convicted of first-degree unlawful sexual penetration and first-degree sexual abuse. He assigns error to the trial court's admission of several out-of-court statements made by the alleged victim, A. We review for errors of law, *State v. Mack*, 337 Or 586, 590, 101 P3d 349 (2004), and reverse.

Defendant lived with his girlfriend (A's mother), and their two children, two-year-old M and three-year-old A. At trial, A's mother testified that defendant was a doting father and that he and A generally got along well. She also testified that, for some months before the incident that gave rise to this case, A had been exhibiting "bad behavior" and had become difficult to deal with.

On a Friday night in September 2003, A's mother arrived home between 10:30 and 11:00 p.m.; defendant had been home alone with the children. As A's mother entered the house, she saw a tube of "generic KY jelly" on the clothes dryer. On Monday morning, when A's mother was getting A dressed, she noticed that her "private areas were red and irritated and swollen." A's mother said, "It looks like you've got an owie in your privates. Let's put some cream on it." A responded, "Daddy gave me an owie in my privates." When A's mother asked what she meant, A responded, "Daddy took his finger and he rubbed me right here," and she pulled back her labia and rubbed her clitoral area. A's mother questioned A further, and A reported that defendant was naked when he had touched her. Although A's mother had noticed some vaginal redness or irritation on A several times over the preceding several months, it was not as severe as it was that day.

The next morning, as they were getting ready to go, A told her mother, "Daddy put a new hole in my body." That evening, A's mother asked defendant if he could explain A's statements; he responded that he did not know what she was talking about. The following morning, A began talking again to her mother about the "owie" and about, as the mother testified, defendant "putting a hole in her body and hurting her with his fingernail. She got more detailed about how that— what the owie was where his fingernail was poking and it

hurt her when he made the new hole in her body * * *." A's mother decided to take A to A's regular doctor.

The next day, after talking on the telephone to an on-call doctor at A's doctor's office (A's regular doctor was out of the office) A's mother believed that "something ha[d] happened that was more than just a misunderstanding." A's mother made an appointment with A's regular doctor for the following Monday, the first day that the doctor would be back in the office. A continued to bring the incident up to her mother each day. A's mother continued to question defendant about A's statements, but his sole explanation was that she must have been referring to a time when they were rolling around on the floor together, playing. When A's mother told defendant that she was going to take A to the doctor, he became angry and threatened to leave her.

On the following Monday, A's mother took A to work with her until her afternoon doctor's appointment. At the mother's office, one of the mother's coworkers asked A if she was going to the doctor because she was sick. A replied, "No, my daddy gave me a hole in my body," and lifted her skirt, pointing.

That afternoon, when A's doctor examined her, the doctor noted irritation on A's labia. The doctor asked A if anyone had touched her there and A responded that "her daddy put a hole in" her private area. A also told the doctor that defendant had touched her with his finger. Later, after A's doctor had finished examining her, the doctor contacted CARES Northwest.[1] The doctor also made a report to the child abuse hotline and filed a report with the Department of Human Services. A copy of the latter report was forwarded to the Forest Grove Police Department.

CARES is a regional child abuse assessment center for the northern region of the state. When a child arrives at CARES, she is met by an interviewer and an examiner. After staff explain to the child and the parent or guardian how the CARES process works, a medical and social history is gathered from the parent or guardian. The child is then examined

---

[1] The acronym CARES originally stood for "Child Abuse Response and Evaluation Services."

by a physician, outside the parent's or guardian's presence. For younger children, no further interview takes place, because of their shortened attention span. Older children undergo a videotaped interview. The child then is escorted back to the waiting room, and the parent or guardian is taken into the interview room where he or she is debriefed. Based on the examination, the CARES physician makes a diagnosis.

Forest Grove Police Detective Herb described the function of CARES. When an alleged child abuse victim is under the age of 13 or 14, the policy of the Forest Grove Police Department is to arrange a CARES interview of the child. The CARES interview "serves as a substitute for what previously was a police function; that is, interviewing the victim[.]" CARES is "one component" of the investigatory team. It performs an investigatory function for the police and the police "use the information obtained during that CARES appointment for [their] job."

The day after A was examined by her regular doctor, her mother received a telephone call from Detective Foster of the Forest Grove Police Department asking her to schedule an appointment with CARES. They went to CARES that day. CARES physician Dr. Ritzen examined A. Ritzen noted labial irritation and a normal hymen. A told Ritzen that defendant "put a hole in my butt, too," pointing to her genital area. When Ritzen asked A if anyone else had touched her "front private area," A responded that defendant had. That A's disclosures were spontaneous indicated to Ritzen that "[i]t's something that the child is thinking about and is concerned about." When Ritzen asked A if she could point to where on her body she had been touched, Ritzen testified that A "pulled up both labia majora with one hand to reveal her vaginal opening, gesturing towards the vaginal opening with the other hand and said, 'There.'" Ritzen testified that it is very uncommon for a child to illustrate her statement the way A did; in fact, Ritzen testified that she had never seen a child do that before. A told Ritzen that the touching had occurred only once and that her mom had been home when it happened. A told Ritzen that defendant was naked when the touching happened. A also told Ritzen that defendant had poked her eyes. She stated that defendant hurts her with his fingernails

and, when Ritzen asked where on her body that happened, A pointed to her genitals. Ultimately, Ritzen testified that the history and the day's evaluation "were highly concerning for sexual abuse."

During A's examination, following normal protocol, the audio portion was picked up by a microphone and piped into a separate room, where a Department of Human Services caseworker, Forest Grove Police Detective Herb, and a CARES staff interviewer were listening. A was told that the people were listening. Although the police officer who is monitoring the examination may suggest further questions for the CARES physician to ask the alleged victim, those questions will be asked only if they are medically relevant.

At some point in the period following A's initial report to her mother, A told her grandmother that there had been three incidents of abuse. On a number of occasions in the months after September, A told her daycare provider, "Daddy put a hole in my body," and, "Daddy was naughty for touching my privates and he's in timeout."

Following A's examination at CARES, her mother— at the recommendation of the CARES staff—arranged for A to see a therapist. A first saw her therapist in November 2003. In the third session, she told the therapist, "Daddy poked a hole in me." When the therapist asked her where, A replied, "In my private parts. He hurt my private parts." A told the therapist that defendant had hurt her more than once. In her fifth weekly session with the therapist, A disclosed that defendant had abused her in his workshop. A sometimes would cover her genital area when disclosing abuse. A never recanted her statements of abuse; she always was "very certain and very clear." The therapist noted that A's behavior was "pretty typical" of children who had been sexually abused.

Following the CARES evaluation, police arrested defendant. In response to questioning, defendant stated that he might have accidentally touched A inappropriately when they were playing in the living room and he was tickling her. Defendant was charged with first-degree unlawful sexual penetration and first-degree sexual abuse.

Pretrial, the parties litigated the admissibility of A's out-of-court statements. Following a competency hearing, the trial court determined that A was not competent to testify; that ruling is not challenged on appeal. Following that ruling, defendant argued that the statements were inadmissible because, among other reasons, their admission would violate his Sixth Amendment right to confront witnesses against him. The trial court ruled that the statements were admissible and, as set forth above, they were admitted at trial. The jury convicted defendant of both charges.

■    On appeal, defendant argues that A's out-of-court statements to CARES physician Ritzen were "testimonial" as that term was used by the United States Supreme Court in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), and that their admission (through Ritzen's testimony) therefore violated his right under the Sixth Amendment to the United States Constitution to confront witnesses against him. He also argues, with less force, that A's statements to the other witnesses—her mother, her grandmother, the therapist, the coworker, and the childcare provider—also were testimonial and therefore should have been excluded. The state essentially concedes that the trial court erroneously admitted A's statements to Ritzen, but argues that the error was harmless. For the reasons explained below, we conclude that the trial court erred in allowing Ritzen to testify about A's out-of-court statements. We further conclude that the error was not harmless beyond a reasonable doubt.

In *Mack*, after examining the United States Supreme Court's opinion in *Crawford*, the Oregon Supreme Court explained:

"Under *Crawford*, the initial, and often dispositive, question is whether an out-of-court statement is 'testimonial.' If it is, the statement cannot be admitted in a criminal case unless (1) the defendant had or has the opportunity to cross-examine the declarant, (2) the statement is not admitted for the truth of the matter asserted, or (3) the statement comes within a small class of exceptions to the *Crawford* rule."

337 Or at 592 (footnotes omitted). None of the three exceptions noted by the *Mack* court applies in this case. Here, then,

the dispositive question on the merits is whether A's statements to Ritzen were "testimonial." For the reasons explained in *State ex rel Juv. Dept. v. S. P.*, 218 Or App 131, 178 P3d 318 (2008), and *State v. Pitt*, 209 Or App 270, 147 P3d 940 (2006), *adh'd to on recons*, 212 Or App 523, 159 P3d 329 (2007), we conclude that they were.

In *Pitt*, the alleged victim of sexual abuse was interviewed first by a physician at the Lighthouse, a "child abuse assessment center." She later made statements to a clinical psychologist. Finally, she took part in a videotaped interview at the Lane County Child Advocacy Center. 209 Or App at 272-73. After the trial court found the alleged victim to be unavailable, the state introduced—over the defendant's hearsay objection—the out-of-court statements she made to the various adults.

On appeal, the defendant in *Pitt* argued that the trial court committed plain error under *Crawford* in admitting the alleged victim's hearsay statements. We agreed that the trial court had committed plain error and we exercised our discretion to address the defendant's claim. *Id.* at 276. Relying on *Crawford*, *Mack*, and the consolidated cases reported as *Davis v. Washington*, 547 US 813, 126 S Ct 2266, 165 L Ed 2d 244 (2006) (*Davis/Hammon*), we concluded that the hearsay statements were "testimonial," and therefore inadmissible in light of the alleged victim's unavailability. We explained:

"[W]e readily conclude that the children's interview[s] * * * at the Lane County Child Advocacy Center were 'testimonial' under *Mack* and *Davis*. The circumstances of the interview do not differ in a meaningful way from those in *Mack*. In this case, as in that one, the interviewer interviewed and elicited statements from a young child 'so that police officers could videotape them for use in a criminal proceeding.' *Mack*, 337 Or at 593. Although, as in *Mack*, the interviews were not conducted by a police officer, they were conducted for the express purpose of furthering a police investigation, with a police officer recording them and with the interviewer explicitly attempting to solicit information from the children that would be useful for defendant's prosecution. [The center's director] testified that the 'whole

idea' of the operation is that parents know that their children are interviewed on tape so that their statements can be used in the course of a prosecution. Under *Mack*, therefore, [the director] was acting as an 'agent' for the police. 337 Or at 594."

*Pitt*, 209 Or App at 278-79.

Similarly, in *S. P.*, the three-year-old alleged victim made statements during an interview with CARES staff about alleged abuse that later were admitted in a juvenile delinquency proceeding, over the youth's *Crawford* objection. On appeal, the youth renewed his *Crawford* argument, and we agreed with it. After discussing *Crawford*, *Davis/Hammon*, *Mack*, and *Pitt* in some detail, we concluded that the out-of-court statements made during the CARES interview were testimonial and therefore inadmissible. 218 Or App at 156.

Our conclusion in *S. P.* was based on the nature of the CARES program, as substantiated in that record. After describing the CARES program in detail, 218 Or App at 149-52, we summarized the role of the program as follows:

"The record in this case pertaining to CARES generally, and this evaluation particularly, compels two conclusions. First, the CARES interview process serves multiple concurrent purposes. To be sure, one of those purposes is to obtain an accurate diagnosis of whether a child has, in fact, been sexually abused—which, in turn, will promote effective medical and psychological treatment (albeit not by CARES itself). But CARES also functions as an informational clearinghouse for police and child welfare authorities, so that they can deal effectively with perpetrators of child sex abuse. As the juvenile court recognized, the CARES process is designed to 'minimize the likelihood of contamination' of a child's statements from suggestive questioning techniques or multiple interviews by different questioners—and, thus, to provide not only treatment providers but also law enforcement authorities with the cleanest, most credible evidence of abuse.

"* * * * *

"The second conclusion that this record compels is that, contrary to the state's contention, the involvement of law enforcement in the CARES process is hardly 'minimal.'

> Rather, it is pervasive. It is true—as the state empha-
> sizes—that there is no evidence that police officers or pros-
> ecutors participated in the development of the CARES pro-
> tocol and that here [the police officer] had no visible
> presence during the interview and merely observed pas-
> sively. But it is also true that not only did [the police officer]
> observe the entire interview (as did the officer in *Pitt*), but
> he also was present during the evaluation team's consulta-
> tion and immediately thereafter met with [the alleged vic-
> tim's] mother in the CARES facility's interview room to dis-
> cuss the course of the prosecution. The close connection
> between CARES and law enforcement authorities is further
> corroborated by (1) CARES' routine practice of providing
> police agencies with complete copies of its evaluation
> reports (while providing only abridged 'summaries' to par-
> ents) and (2) CARES' 'treatment recommendation' urging
> 'further investigation by DHS and law enforcement into
> these allegations of abuse.' "

218 Or App at 152-53.

Our decisions in *Pitt* and *S. P.* make it clear that the out-of-court statements in this case were testimonial and that their admission violated defendant's Sixth Amendment right to confront witnesses against him. The record in this case, like the record in *S. P.*, demonstrates that A's state-ments to Ritzen were testimonial. As in *S. P.*, the statements were made to a CARES evaluator, after a police agency referred A to CARES. The CARES clinic is designed so that the examinations and interviews can be monitored; in this case Detective Herb was in a separate room with headphones that allowed him to listen to A's examination. The record in this case, like the record in *S. P.*, indicates that CARES works closely with law enforcement agencies in gathering evidence of child sexual abuse. As in *Mack*, "[t]here can be little doubt that, if the police officers had conducted these interviews with [A], the resulting statements would be testimonial." 337 Or at 593. In short, as in *S. P.*, A's statements to the CARES physician were testimonial. Because defendant did not have an opportunity to cross-examine A, it follows that admission of her out-of-court statements was error.

As noted, the state recognizes the weakness in its position that the trial did not err in admitting A's statements

to CARES physician Ritzen. But the state asserts that the error in admitting the out-of-court statements was harmless:

> "Because the CARES statements were merely cumulative of other properly admitted evidence—*viz.*, the numerous other out-of-court statements by A that established the very same abuse that A talked about in the CARES interview— even assuming the CARES statements were erroneously admitted, the error was harmless beyond a reasonable doubt."

Defendant, not surprisingly, disagrees:

> "Given the evidence in this case, it cannot be said that [A]'s statements to the CARES doctor did not contribute to the verdict against defendant. Indeed, it is likely that the jury relied on [A]'s statements to the CARES doctor because of (1) their details, (2) the fact that they were made to a neutral witness with professional training and experience in questioning children about sexual abuse, (3) the fact that they were made in a formal setting and witnessed by multiple persons, including a police officer, and (4) the fact that the CARES doctor relied on them to make her diagnosis."

Whether a federal constitutional error is harmless is a question of federal law. *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) (citing *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967)). "Such a deprivation of a federal constitutional right is harmless only when the reviewing court, in looking at the record as a whole, can say that the error, beyond a reasonable doubt, has not contributed to the determination of guilt. *Chapman*, 386 US at 24; *see also State v. Ennis*, 212 Or App 240, 158 P3d 510 (2007) (applying same standard)." *Pitt*, 212 Or App at 527. In reviewing the whole record to determine whether an error was harmless, the court should consider "the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, * * * and, of course, the overall strength of the prosecution's case." *Cook*, 340 Or at 544 (quoting *Delaware v. Van Arsdall*, 475 US 673, 684, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (brackets and ellipsis in *Cook*)).

Applying that standard, we agree with defendant that the error in admitting A's statements was not harmless beyond a reasonable doubt. *Cf. State v. Shelton*, 218 Or App 652, 658-60, 180 P3d 155 (2008) (concluding that the medical assistant's testimony about a spontaneous and nonspecific statement by the victim—whether testimonial or not—was harmless error beyond a reasonable doubt because it was admitted only to corroborate the defendant's confession). Initially, for purposes of our harmless error analysis, we assume without deciding that the trial court correctly admitted A's out-of-court statements to her mother, her grandmother, her therapist, her childcare provider, and her mother's coworker. But even with that assumption, for the reasons explained below, we conclude that the state did not meet its burden of demonstrating beyond a reasonable doubt that the trial court's error was harmless.

Although the state is correct in a sense that the statements A made to Ritzen and that were admitted through the latter's testimony were "merely cumulative" of other out-of-court statements that A made, the inquiry does not end there. To be sure, a number of other witnesses testified about A's statements that defendant had "put a hole in her." And, although it is true that, when several witnesses testify to the same effect, the erroneous admission of one witness's testimony often will be harmless, the role and status of each witness also is relevant to the harmless error determination.

Here, both Ritzen's status as a neutral professional—she testified that she specializes in forensic pediatrics—and certain details of A's statements to Ritzen mean that her repetition of A's statements to the jury likely had a qualitatively different effect on their verdict than did the recounting of A's statements by other witnesses. Thus, even if A's statements to Ritzen had been identical to A's statements to the other witnesses—which they arguably were not—Ritzen's unique training and experience in child abuse assessment would likely have given the statements greater weight in the jury's eyes. As defendant argues, "Given the CARES doctor's recognized expertise, it is likely that the jury relied on the doctor's testimony to conclude that [A] actually made the statements the doctor said she made and that the

doctor did not ask leading questions or otherwise suggest or encourage [A's] statements." Moreover, the jurors likely gave Ritzen's testimony regarding A's statements greater weight because they knew that Ritzen used the statements to support her diagnosis of sexual abuse. *Cf. State v. Keller*, 315 Or 273, 286, 844 P2d 195 (1993) (Erroneous admission of CARES physician's comment on alleged victim's credibility not harmless, as witness was "medical doctor with extensive professional experience in the area of child sexual abuse, and she testified in an authoritative and detailed manner about that subject."); *State v. Ogden*, 168 Or App 249, 258, 6 P3d 1110, *adh'd to as modified on recons*, 169 Or App 469, 6 P3d 1109 (2000), *rev den*, 331 Or 692 (2001) ("The concern with respect to expert testimony is that juries tend to afford such evidence undue weight * * *.").

■     In short, in this case, the source of the erroneously admitted statements figures heavily in our harmless error analysis. Under the federal constitution, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 US at 681. In light of the importance of Ritzen's testimony, the scant corroborating evidence, and the overall strength of the state's case, we cannot "confidently say" that admission of A's statements to Ritzen was harmless beyond a reasonable doubt.

Reversed and remanded.