Submitted December 16, 2010, affirmed June 22, 2011

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**ARMANDO MORENO-GARCIA,**
*Defendant-Appellant.*

Multnomah County Circuit Court
060935450; A140647

260 P3d 522

Peter Gartlan, Chief Defender, and Shawn E. Wiley, Chief Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Justice J. Rillera, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Senior Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant was convicted of first-degree manslaughter, ORS 163.118, based on his reckless failure to seek medical attention for his two-year-old foster child that he was in the process of adopting. On appeal, he argues that the court erred in admitting evidence about physical abuse suffered by the victim's sister; that evidence, he contends, had no relevance to the question of whether defendant failed to seek medical attention for the victim. He also argues that the same evidence was testimonial and, therefore, admitting it violated his Confrontation Clause rights under the Sixth Amendment to the United States Constitution. We conclude that the trial court erred in admitting the evidence, but we nonetheless affirm, because we also conclude that the error did not affect the verdict. Or Const, Art VII (Amended), § 3.[1]

Defendant and his wife (the Morenos) lived in Southern California when the victim, K, and her sister J were taken into protective custody in Oregon and placed with a foster family, the Pughs. J's father is defendant's brother. When the Morenos heard about K and J's placement, they informed DHS that they were interested in adopting the girls. They relocated their family from Southern California to Gresham, Oregon, in order to facilitate the adoption process. Their plan was to act as the children's foster parents for six months before adopting them. This plan involved visits with the children at the Pughs' home, defendant's home, or group outings.

As foster parents, the Morenos underwent training in May and June of 2006. The training included lessons on appropriate discipline, medical care, and parental responsibilities. Specifically, the classes stressed the necessity of adequate medical care for the children; parents were instructed to be extremely vigilant and to call 9-1-1 in any emergency. The Morenos received a medical card for J and K and were told that all medical expenses would be covered by the state.

---

[1] Article VII (Amended), section 3, of the Oregon Constitution provides that, if "the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

The girls were transferred to the Morenos' care in June of 2006.

At 2:24 p.m. on September 4, 2006, the Morenos brought K, then just over two years old, to the emergency room at Mt. Hood Medical Center. She was dead on arrival. The attending doctor, Dr. Shawler, immediately observed signs of physical abuse on K's body, including significant bruising, burn marks on her feet, patches of missing hair, and knots on her head. He also noted that she was emaciated and pale. Most significantly, K's stomach was extremely distended, resembling a basketball, an indication of substantial internal injury and pressure. The hospital staff called the local police to report suspected child abuse.

An autopsy performed by Dr. Gunson, the State Medical Examiner, revealed that the cause of death was a blunt force trauma to the abdomen which resulted in contusion of the small bowel and subsequent perforation of the small intestine—in lay terms, K had received a blow to the stomach that was so severe that it pushed her intestines against her spinal column with such force that it caused bruising on her spinal column, and the small intestine was injured to the point that it began to die and perforate. Holes had formed in K's bowel about 24 hours before her death, allowing waste and bacteria to seep into her stomach. As air flowed into her stomach cavity from the holes in her bowel, her stomach expanded and became grossly enlarged. The medical examiner estimated that the blow to the abdomen occurred two to three days before the intestine ruptured, which would have occurred 24 hours before a slow and painful death.

The autopsy also showed numerous external wounds, including bruises on K's face and body, as well as burns on her feet, chest, and arms. She also had a bruise on her upper lip, a cut that was healing on her inner bottom lip, and a cracked rib that had not been set and had already started healing. Gunson listed the cause of death as Battered Child Syndrome with terminal blunt force abdominal injury. Based on K's body temperature when she arrived at the hospital at 2:24 p.m., her time of death was estimated to have been around two hours earlier.

Defendant and his wife were questioned separately about K's behavior and activities in the days prior to her death. The answers given were confusing and contradictory. Defendant explained that on Sunday, the day before she was taken to the hospital, K was fine, had joined the family in a trip to Wal-Mart, and had eaten potatoes and tuna fish. Defendant told police that, on the day she died, K got up around 8:30 a.m. to use the bathroom and then slept until 10:00 a.m. He explained that she seemed sleepy and lethargic and did not eat her breakfast. He said that she felt cold and, because it was a warm day, he took her outside with him as he washed his truck. He sat her in the sun, but she could not hold herself upright in a sitting position. He said he put her back to bed and checked on her every 30 minutes.

The police again interviewed defendant the following day, and his story changed dramatically. Defendant told police that he saw his cousin, Rogelio, kick K multiple times in the stomach on Sunday evening. Defendant said that he and Rogelio were drinking outside when Rogelio needed to use the bathroom. Rogelio, defendant explained, often became impatient and agitated when the children took too long to eat or use the bathroom. Defendant said that, when he went inside, he saw Rogelio hold K by the hair and kick her in the stomach three times, then knee her in the stomach. Defendant said that K was whimpering and having difficultly breathing, but she was not crying, so he put her to bed. He said he did not tell his wife about the incident because he did not want her to get mad at Rogelio, and he did not initially tell the police because he did not want to get his cousin in trouble. Defendant later admitted at trial that he had fabricated the story about Rogelio in order to "protect his family."

The police searched defendant's house the day after K's death and found a spotless home with beds made, no dirty dishes, towels and clothes hung up, and toys put away, suggesting that defendant and his wife had cleaned the house before bringing K to the hospital.

Defendant's neighbors, Alberto and Karen Rodriguez, had not seen K in the two weeks prior to her death, which was unusual. The Rodriguezes would drop their

children off at the Morenos' home when they went to work and defendant's wife would watch over all the children. When Karen asked defendant's wife where K was, she told Karen that K had gone on a beach vacation with her former foster parents, the Pughs. Karen saw K the weekend before she died. She explained that K looked very sad and was trembling. When Karen asked defendant's wife what was wrong with K, she replied that she had just bathed K and that K was very sensitive to cold water.

On the morning of September 4—the day of K's death—Karen dropped her children at the Morenos' as usual. She did not see any of the Morenos' children. Karen asked how K was doing, and defendant's wife said K was running a slight fever and was crying a little bit, but was otherwise okay. She found out the next day that K had died.

On September 6, Karen was quoted in newspaper accounts of K's death as saying that the police should be questioning the Pughs, whom Karen believed K had been with up until a few days before her death. After the newspaper printed the story, Karen was subpoenaed to testify before the grand jury. The day before Karen was scheduled to testify, defendant told her to stop telling people that K was with the Pughs because it was not true. He explained that K was actually sick and had been at home during those two weeks and he was not sure why his wife had lied to her.

The day following K's death, the Morenos' three other children—J and their two biological children—were taken to CARES Northwest to be examined and interviewed by the physicians there. CARES provides a setting for the determination of whether a child has been abused. Dr. Keltner conducted the physical examination and interview of J. J had a number of bruises in varying stages of healing on her forehead, cheeks, and around her mouth. She also had bruises on both ears, which is highly unusual and not normally the product of an accident or fall. J also had bruises on her left shoulder, both arms, both legs, and bruises of various sizes on her back. Many of the bruises were "pattern bruises," which meant she was hit with something that left a distinctive mark. Additionally, J also had a broken rib on her

right side that was starting to heal. Keltner diagnosed J with Battered Child Syndrome.

After further investigation, defendant was charged with manslaughter and his wife was charged with murder for K's death. Defendant's wife pleaded guilty to the death of K and abuse of J. She is currently serving a 144-month sentence. Defendant's case proceeded to trial, where the state's theory was that defendant recklessly caused K's death by failing to seek medical attention for her at a time when it was obvious that she was sick and could die. As part of its case, the state called Dr. Lorenz as a witness. Lorenz worked for CARES, but was not the doctor who examined J. Among other things, Lorenz testified as to Keltner's examination of J and, as an expert witness under OEC 702, agreed with Keltner's conclusion that J suffered from child abuse. Defendant objected to Lorenz's testimony on two grounds: that the abuse of J was not relevant to the state's theory against defendant; and that Keltner's report was "testimonial" hearsay under *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), and, therefore, admitting the hearsay through Lorenz's testimony violated defendant's right under the Confrontation Clause of the Sixth Amendment. The trial court disagreed and admitted the evidence. The jury subsequently convicted defendant of manslaughter in the first degree. This appeal followed. Defendant renews the arguments he made at trial. We address each in turn.

First, defendant argues that evidence of J's abuse was not relevant to the charges against defendant. Specifically, defendant argues that

"[t]he state's theory underlying [defendant's charge of manslaughter] was that defendant recklessly caused the death of [K] by failing to seek medical help for [K] at a time that it was obvious that [K] was very ill and could die. * * * The state's theory was not that defendant caused those injuries, but that he failed to seek medical attention upon observing the physical symptoms."

The state responds that the evidence was relevant in order to address defendant's theory at trial—that defendant "was the breadwinner and not the primary caregiver of the children,

and as such, he was not aware of [K's] abuse." Defendant testified that, if he had seen bruises on any of the children, he would have talked to his wife or children about them and he would have sought help. Therefore, the state argues, the fact that J was also being abused and had clear marks on her body was relevant to address the defendant's exculpatory testimony.

We understand that the threshold for admission of evidence on grounds of relevance is low: "[E]vidence is relevant so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000); OEC 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Nonetheless, we are unable to conclude that the fact that J was abused, *per se*, increases the probability that defendant observed the signs of abuse on K and did not seek treatment. On the other hand, the additional fact that J's body had bruises in various stages of healing, and that nobody had sought medical treatment for them, might indeed increase the probability that defendant was, for one reason or another, unwilling to seek medical help for his injured children. We need not decide this close question, however, because we conclude that the evidence regarding J was inadmissible for the reason argued by defendant in his second assignment of error: Admitting the evidence violated his Confrontation Clause rights under the Sixth Amendment.

Under *Crawford*, 541 US at 53-54, the admission against a defendant of "testimonial" hearsay without an opportunity for cross-examination violates the defendant's Sixth Amendment right to confront an adverse witness. In distinguishing "testimonial" from "nontestimonial" hearsay, the United States Supreme Court explained in *Davis v. Washington*, 547 US 813, 822, 126 S Ct 2266, 165 L Ed 2d 224 (2006), that a statement is testimonial when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

In addressing that same issue, we concluded in *State ex rel Juv. Dept. v. S. P.*, 218 Or App 131, 155-56, 178 P3d 318 (2008), *aff'd*, 346 Or 592, 215 P3d 847 (2009), that the victim's hearsay statements—statements to a CARES physician by a child victim of sex abuse—were testimonial under the Sixth Amendment. In that case, the state referred the victim's parents to CARES for the purpose of furthering a criminal abuse investigation, and a Clackamas County Sheriff's deputy watched the CARES interview through a one-way mirror. We noted that, in general, relevant factors in determining whether a statement is testimonial include the declarant's purpose in making the statement, the questioner's purpose in talking to the declarant, and the amount of police involvement in the questioning, and that, in the context of a child abuse investigation, the victim's purpose in making a statement is less important than the other factors. *Id.* at 154-56. In reversing the youth's conviction, we noted that a primary purpose of the CARES interview with the victim was to create evidence for use in a future prosecution and that there was significant law enforcement involvement in the interview. *Id.* at 154-55.

Defendant argues that the same is true here. The state responds that not all of what CARES does is forensic; some of its function is also diagnostic. According to the state, Keltner's examination of J was purely diagnostic and, therefore, nontestimonial in nature. We agree with defendant. As the Supreme Court explained in *S. P.*:

> "After an evaluation is complete, the CARES staff will make referrals to various treatment providers, based on the victim's needs. CARES itself does not provide treatment, but provides the family of the victim with treatment recommendations. CARES also routinely will provide law enforcement with the results of its evaluations. In turn, law enforcement personnel will send possible abuse victims to CARES."

346 Or at 613-14. Lorenz testified consistently with the above description. When asked specifically about why J and defendant's other two daughters were brought to CARES for evaluation, Lorenz explained:

"We know when a child dies unexpectedly or with concerning circumstances, there's—a couple of things can happen with the other kids at home. *They may also have been the victim.* If the child died of physical abuse, *other children in the home may have also been physically abused.* So we see them to be sure that they're healthy.

"*They may have witnessed the event* that led to the child's death or they *may have witnessed other events that occurred with the child who died.* And the concern being that if there's other risk factors in the household, we need to be sure and get that child into counseling to be able to deal with the emotions around what they may have seen in the days or months before the child died."

(Emphases added.)

Although we agree with the state that CARES's functions are diagnostic and forensic, the forensic aspect is pervasive. *See S. P.*, 218 Or App at 153. As Lorenz's testimony indicates, CARES works extensively with local law enforcement officials. Its "standard procedure" includes taking referrals from law enforcement; "community partners," including law enforcement, "may be listening" to interviews; and "the information that we get, we share with law enforcement." The children in the present case were brought into CARES to be interviewed only after K's death. Although one purpose of the exam and interview was to ensure that the children were safe, another was to see if they too were being abused or if they "may have witnessed the event that led to the child's death or they may have witnessed other events that occurred with the child who died." That line of inquiry was primarily investigatory. Although the record does not reveal whether, as in *S. P.*, law enforcement officials in this case observed the interview through a one-way mirror and listened to the examination from another room—facts that might distinguish this case from *S. P.*—the state, as proponent of the hearsay evidence, had the burden of adducing facts that might have established that the statements were nontestimonial and therefore admissible, but it failed to do so. *See State v. Steen*, 215 Or App 635, 640, 170 P3d 1126 (2007), *aff'd*, 346 Or 143, 206 P3d 614 (2009) (in *Crawford* case, state as proponent of hearsay had burden of establishing declarant's unavailability). We therefore conclude that

the medical information produced by Keltner and recounted by Lorenz was testimonial and inadmissible under *Crawford* and *Davis*.

Nonetheless, reversal is not warranted. That is so because admitting the evidence was harmless, and, under such circumstances, Article VII (Amended), section 3, of the Oregon Constitution requires that the "judgment shall be affirmed, notwithstanding any error committed during the trial." To determine whether a federal constitutional error is harmless, even in a state case, the federal standard for harmless error applies:

> "[T]he conviction will be upheld, 'if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (describing the test announced in *Chapman* [*v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967)]. In reviewing the whole record to determine whether an error was harmless, the court should consider 'the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, * * * and, of course, the overall strength of the prosecution's case.' *Id.* at 684."

*State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) (second bracket and omission in original).

The overwhelming, uncontroverted, nonhearsay evidence presented at trial was that K was in severe pain 24 hours before her death and that she had died two hours before defendant brought her to the emergency room. The emergency room doctor testified that, instead of being pink, K was dusky and pale, which indicated that she had no circulation in her body. Her abdomen was immediately noticeable because it was distended—not in the way that an overweight toddler's can be, but "prominent and distended in size and in shape" like a basketball or volleyball. She had several bruises on her arms and legs and the skin on her belly was discolored. It was clear to all the medical professionals who examined her that K had died two hours before defendant ever set foot in the hospital.

Lorenz testified without contradiction that, given K's injuries, she would have exhibited symptoms such as vomiting, fever, listlessness, lethargy, stomach pain, and poor appetite, and that those symptoms would have become progressively more pronounced over time. She testified that K would have "looked very sick" with a "big distended tummy" on the day she died. Lorenz further stated that K probably did not walk, eat, or even vomit the day she died because there was nothing left in her system.

All of the above evidence was uncontroverted. Additionally, defendant testified that he did see bruises on both girls and that K always had more bruises. He testified that, on the day K died, she "couldn't keep herself upright, and * * * I noticed it more * * * when she fell to the side by the door." Defendant said he saw this at 10:30 a.m., but did not take her to the emergency room until 2:30 p.m.

The jury also heard uncontradicted evidence that defendant's wife was, at the time of trial, serving a two-year sentence for abuse of J. Thus, the fact that J was also abused was before the jury regardless of Lorenz's hearsay testimony.

In light of this uncontroverted evidence, Lorenz's hearsay testimony about J's injuries could not have had any significant effect on the only question before the jury, that is, whether defendant recklessly withheld medical treatment. The testimony takes up approximately two pages of the nearly 1,000-page transcript. In that testimony, Lorenz pointed out, on a "map" that Keltner had prepared, places where J had bruises. She also described the bruises and noted that some of them were consistent with physical abuse. The only potentially relevant testimony is this sentence: "She's got bruises of different ages; some of them are yellow-green; some of them are resolving[.]" Lorenz summarizes her brief testimony as follows: "So just lots of pattern bruises. Much, much, much more than you'd expect for a child to occur accidentally."

We conclude that, beyond a reasonable doubt, the erroneously admitted testimony regarding injuries to K's sister could not have had an effect on the verdict. Accordingly,

any error by the court in admitting the evidence about J was harmless.

Affirmed.