Argued and submitted August 30, affirmed October 4, 2023, petition for review denied March 7, 2024 (372 Or 107)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# EDMOND LEMONT CASE, JR.,
aka Edward Lemont Case, Jr.,
*Defendant-Appellant.*

## Polk County Circuit Court
17CR61289; A177244

538 P3d 902

Defendant appeals from a judgment of conviction after a bench trial for one count of first-degree sexual abuse, based on his digital penetration of the anus of the three-year-old victim, IP. Defendant assigns error to the trial court's rejection of his Confrontation Clause objections to the admission of testimony describing IP's statements to a Liberty House physician during a medical examination conducted shortly after the alleged sexual abuse, after the court determined that IP's statements were not "testimonial" and were therefore admissible under OEC 803(18a)(b)(1). Defendant also assigns error to the denial of his motion for a judgment of acquittal, asserting a lack of evidence as to defendant's sexual purpose in inserting his finger in IP's anus, and to his mandatory sentence of 75 months' imprisonment under ORS 137.700, as constitutionally disproportionate. *Held*: In light of Liberty House's close connection with law enforcement and in the context in which IP made his statements, the Court of Appeals held that IP's statements must be regarded as testimonial, and that the trial court therefore erred in admitting them. However, because the statements were duplicative of statements that IP had made to his parents and that were corroborated by other evidence, the court concluded that the error was harmless beyond a reasonable doubt under the federal standard for harmless error, and that the error did not require reversal. The court also rejected defendant's challenge to the denial of his motion for a judgment of acquittal, determining that the evidence was sufficient to allow the trier of fact to determine that defendant's fingering of IP's anus had a sexual purpose, and further concluded that defendant's sentence of 75 months was not constitutionally disproportionate.

Affirmed.

Rafael A. Caso, Judge.

Rond Chananudech, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

KAMINS, J.

Affirmed.

**KAMINS, J.**

Defendant appeals from a judgment of conviction after a bench trial for one count of first-degree sexual abuse, based on his digital penetration of the anus of the three-year-old victim, IP.[1] The state filed a notice of its intent to rely on IP's hearsay statements describing the abuse to his parents and to a Liberty House doctor under OEC 803(18a)(b), an exception to the hearsay rule.[2] IP, who was age eight at the time of trial, did not testify at trial, because, after engaging in colloquy with IP, the court determined that IP was "unavailable," in the sense that he lacked any memory of the events on which the charge was based. But over defendant's Confrontation Clause objections,[3] the trial court admitted testimony describing IP's statements to his parents and to a Liberty House physician during a medical examination conducted shortly after the sexual abuse. The court determined that the statements were not "testimonial" and that the statements therefore could come in under OEC 803(18a)(b)(1). Defendant assigns error to the trial court's ruling as to the statements made to the Liberty House doctor, as well as to the denial of defendant's motion for a judgment of acquittal and to his sentence. We conclude that the trial court did err in admitting the statements through testimony of a Liberty House forensic examiner, but that the error was harmless. We further reject defendant's other assignments and therefore affirm.

We summarize the evidence at trial. IP and his younger sister AP were at their babysitter's house while

---

[1] We note that this is defendant's second appeal. *See State v. Case*, 310 Or App 567, 484 P3d 1130 (2021) (reversing and remanding defendant's conviction of first-degree sexual abuse on the state's concession under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020)).

[2] OEC 803(18a)(b) allows the admission of hearsay statements concerning certain acts of abuse as defined in ORS 107.705 or ORS 419B.005, including child sexual abuse. It applies to "a child declarant, a declarant who is an elderly person as defined in ORS 124.050[,] or an adult declarant with a developmental disability." OEC 803(18a)(d). It applies only if either the declarant "testifies at the proceeding and is subject to cross-examination," or the declarant "is unavailable as a witness" and certain criteria are met.

[3] The Sixth Amendment's Confrontation Clause, which is binding on the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him."

their parents were at work. After the children had gone to sleep, the babysitter, with the parents' permission, left her own children as well as IP and AP in the care of defendant, who was the babysitter's father and who was living in the home. When IP and AP's father, Joseph, came to pick up the children, he found IP awake in bed and rocking back and forth, upset, and crying, and having urinated in his pants, which the parents testified was unusual, because IP was toilet trained and could go to the bathroom on his own.

Two days later, as the children were settling down for their nap, AP reported to the children's mother, Sarah, that IP was putting his finger in her butt; Sarah observed IP putting his finger through AP's diaper and told IP, "We can't be doing that." IP responded, "but grandpa did this to my butthole,"[4] gesturing with one finger in a circular motion.

Sarah became concerned that IP had been sexually abused and reported the interaction to Joseph. Joseph testified that he sought to determine who had engaged in that contact with IP and that, later that day, on Joseph's request, Sarah created a collage on her phone of three photos, IP's two biological grandfathers and defendant. Joseph showed the collage to IP and asked him something "along the lines of 'Which grandpa did it?'" IP pointed to defendant.

Sarah contacted the police, who did not interview IP but told the parents not to discuss the matter with IP and to schedule an appointment for an evaluation of IP at Liberty House. Before the scheduled appointment with Liberty House, Sarah took IP to the emergency room and to the family's doctor, who did not identify any physical signs of abuse.

In evaluating IP, Liberty House determined that IP was too young to participate in a forensic interview. But a Liberty House doctor conducted a medical examination, and Holly Williams, who was then a forensic examiner for Liberty House, observed the examination and took notes, which she sent in a report to the Salem Police Department.

The state called Williams as a witness at trial. Williams described her educational background, which

---

[4] It is undisputed that defendant is not IP's grandfather, but that "grandpa" is how the babysitter's children and IP referred to him.

includes a master's degree in counselling, and her years of work experience with Liberty House, which includes several years as a forensic examiner. Williams explained that she had received training as a forensic examiner from Child Abuse Response and Evaluation Service (CARES) and was trained to interview children with specific, nonleading questions.

Williams also described the medical/well-child examination that Liberty House conducted with IP. She testified that, during a medical/well-child examination, the doctor asks the child neutral, open-ended questions about all parts of the body, starting "usually at the top":

> "Start at the head, and they just go down. And they say things like, 'Has something happened to your head?' 'Has something happened to your eyes, to your ears,' and they go all the way down."

Williams testified that, in the doctor's examination of IP, the doctor asked IP whether anyone had hurt his ears, and IP responded spontaneously, "Grandpa put his finger in my butt." Williams opined that IP likely blurted out that response because it was on his mind. She testified that, seeking clarification, the doctor asked IP, "Who?" IP replied, "Grandpa did it." The doctor asked, "Where?" IP held up his right index finger and wiggled it in a circular motion. When asked what it felt like, he answered, "In my butt." The doctor's physical examination of IP did not result in any unusual findings.[5]

_____

[5] Williams described the medical examination from her notes:

"[Prosecutor]: Okay. And again, what's the purpose of the medical exam?

"[Williams]: It's to assess the child's health and well-being. And the whole evaluation is to assess a child for possible recommendations for their health and safety.

"[Prosecutor]: Okay. So moving then to the specific medical exam. Do you recall, based on your recollection of—or refreshing your recollection of your report, what [IP] said during that exam?

"[Williams]: Yes. [The doctor] had asked if—what did she—said—asked if someone had hurt his ears. And he responded by saying, 'Grandpa put his finger in my butt.'

"[Prosecutor]: Okay. Now, is that—is that unusual that a child of that age would blurt something out like that?

"[Williams]: No.

"[Prosecutor]: Okay. And do you know, why is that, on your—based on your training and experience?

Defendant raised a Confrontation Clause objection to Williams's description of IP's statements to the doctor. The trial court rejected the objection. In addition to testimony from Williams, the court heard testimony from IP's parents, who described IP's statements and his references to "grandpa," as well as changes in IP's personality after the abuse, from a caring, loving child to an aggressive, angry, and scared child who was afraid to take off his clothes. The court also heard testimony from IP's babysitter, who said that she had little memory of the night, from detectives who had investigated the case, and from a psychologist, who testified on behalf of defendant that interviews of children by untrained persons often are suggestive and that parents often underestimate the influence they have on a child's statements.

---

"[Williams]: Well, it was on his mind. He may have been ready. He wanted to tell somebody. I do remember reading here, too, that he came back with us easily, so he separated from his mother easily. So he may have just been ready. Some kids are; some kids aren't.

"[Prosecutor]: Okay. And then were there more questions asked?

"[Williams]: Yes. [The doctor] then asked him 'Who?' because who she wanted to have clarification. And he said, 'Grandpa did it.'

"Then she asked him 'Where?' And he held up his right hand—his right index finger—and wiggled it in kind of a circular motion.

"[Prosecutor]: Had she asked him to demonstrate anything?

"[Williams]: No.

"[Prosecutor]: Okay. Did he—did she ask anything further?

"[Williams]: Yeah. She asked what it felt like when grandpa put his finger in [IP's] butt, and he said, 'In my butt.'

"[Prosecutor]: All right. In your—in your training and experience, is there effect—is there an effect on a child when talking about their—the body context when going through those questions like that? Does that mean anything for a young child?

"[Williams]: Well, part of the reason that we ask those extra questions, too, in the exam is because, for young children, they respond better if they have concrete context for why questions might be being asked.

"So since she's already talking about the body, that makes sense to him to make those sorts of statements.

"[Prosecutor]: Okay. Would that—in your training and experience, would that apply also then when—if a child was blurting something out when a— when a parent was asking or talking about body or private areas?

"[Williams]: Yes.

"[Prosecutor]: Does that make sense? Okay. And did you feel that he was able to comprehend the questions he was being asked?

"[Williams]: Yes."

In his first assignment, defendant challenges the admission, over his objection, of Williams's testimony describing IP's statements to the Liberty House doctor. Defendant bases his argument first on *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), in which the Court explained that "witnesses," under the Confrontation Clause, are those "who bear testimony," and that "testimony" is "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation marks and alteration omitted). The Court concluded in *Crawford* that the Sixth Amendment of the United States Constitution prohibits the introduction of testimonial statements by a non-testifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54.

Defendant asserts that IP's statements to the Liberty House doctor were testimonial and therefore subject to Confrontation Clause protection under *Crawford*. Defendant argues that determining whether statements are testimonial depends on the context in which they are made, which includes an examination of both the declarant and the examiner. Although defendant acknowledges that, as the trial court found, IP would not have intended his statements to be testimonial, he asserts that IP's statements to the physician were nevertheless testimonial in nature, because they were elicited for purposes of a potential criminal investigation of defendant. Acknowledging that Liberty House is not a part of law enforcement, defendant nonetheless contends that Liberty House acted on behalf of the police. In support of his contention that the Liberty House examination was at least in part for purposes of possible prosecution of defendant, defendant cites Williams's presence during the examination and the sharing of reports and information between Liberty House and the police.

Defendant notes further that in *State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 618, 215 P3d 847 (2009), the Oregon Supreme Court addressed the same issue in the context of CARES medical examinations. There, the court held that "law enforcement involvement in CARES is pervasive, and that CARES evaluations serve a forensic purpose

in addition to any diagnostic purpose." Thus, the court concluded, the statements of a three-year-old child to a CARES doctor and social worker were testimonial and subject to Confrontation Clause protection. *See also State v. Moreno-Garcia*, 243 Or App 571, 576-77, 260 P3d 522 (2011); *State v. Norby*, 218 Or App 609, 180 P3d 752 (2008) (holding that child's statements to CARES physician were testimonial where the child was referred to the clinic, the clinic worked closely with law enforcement, and it allowed police to monitor the interviews). Defendant contends that Liberty House is like CARES, in that it works with law enforcement with dual objectives of protecting children from abuse and assisting law enforcement, and that the Supreme Court's holding in *S. P.* and our holdings in *Moreno-Garcia* and *Norby* should apply with equal force to statements made by IP to the Liberty House doctor.

Although acknowledging that Liberty House is a resource to law enforcement, the state responds that Liberty House is not *part* of law enforcement. Rather, the state asserts, it is a neutral resource for determining whether a child has been abused and providing treatment. The state emphasizes that IP's Liberty House examination was a medical examination, not a forensic examination, and that IP's statements were spontaneous in response to the doctor's neutral question. The state cites Williams's testimony that the purpose of the medical examination is not forensic but "to assess the child's health and well-being. And the whole evaluation is to assess a child for possible recommendations for their health and safety."

The state argues further that, particularly with regard to statements by young children, our opinion in *Moreno-Garcia*, and the Supreme Court's opinion in *S. P.* are likely superseded by the United States Supreme Court's opinion in *Ohio v. Clark*, 576 US 237, 135 S Ct 2173, 192 L Ed 2d 306 (2015), in which the Court, addressing the testimonial nature of statements made by a young child to his teacher, said in *dicta* that the statement of a young child will rarely be testimonial.

The United States Supreme Court's opinion in *Clark*, decided after our own Supreme Court's most recent

formulation of the analysis, does shed light on the considerations applicable to a Confrontation Clause question. We therefore take this opportunity to consider whether or to what extent *S. P.* has been superseded by *Clark*, as well as how those opinions guide our analysis of IP's statements to the Liberty House doctor.

In *Clark*, a three-year-old child came to school with visible bruises. Upon inquiry from the child's teacher, the child made statements that implicated the defendant in abuse. The child was unavailable to testify at trial, and the defendant raised a Confrontation Clause challenge to the admissibility of the child's statements to the teacher. *Id.* at 240.

The Court in *Clark* surveyed its case law on the Confrontation Clause. The Court referenced its opinions in *Davis v. Washington* and *Hammon v. Indiana*, 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006), decided together, which involved statements by victims of domestic abuse given to law enforcement officers. In *Davis*, the challenged statements had been made to a 911 emergency operator during and shortly after the abuser's violent attack. In *Hammon*, the victim's statements were made to police after the victim had been isolated from the abuser, and the statements were memorialized in a "battery affidavit." *Id.* In holding that the statements in *Hammon* were testimonial but that the statements in *Davis* were not, the Court announced what came to be known as the "primary purpose" test:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Id.* at 822. The "primary purpose" test, as enunciated in *Davis v. Washington* and *Hammon v. Indiana*, requires a determination whether the statements made to police were to enable police assistance to meet an ongoing emergency or

to establish or prove past events potentially relevant to later criminal prosecution. *Id.*

The *Clark* Court recognized the primary purpose test but refined it, explaining that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 358 (citing *Michigan v. Bryant*, 562 US 344, 131 S Ct 1143, 179 L Ed 2d 93 (2011)). One consideration is the "informality of the situation and the interrogation." *Id.* A "formal station-house interrogation," like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused. *Id.* at 246. In the end, the Court said, the question is not merely whether the statements were taken or made in the context of an emergency—the question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Id.*

In concluding in *Clark* that there was no Confrontation Clause exclusion in the circumstances before it, the Court reasoned that the child had made the challenged statements to his teacher in the context of an ongoing emergency—*viz.*, the need to determine who was abusing the child and whether it would be safe to send the child home at the end of the day. Thus, the immediate concern was to protect the child, to determine who was abusing him, and to determine whether any other child was at risk. *Id.* at 246-47. For that reason, the court concluded, the primary purpose of the conversation was not testimonial.

The *Clark* Court added that its conclusion was "fortified" by the child's age, because "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause" given that "[f]ew preschool students understand the details of our criminal justice system. *** Thus, it is extremely unlikely that a 3-year-old child *** would intend his statements to be a substitute for trial testimony." *Id.* at 248.

Additionally, the Court emphasized that the child's statements had been made not to law enforcement but to the child's teacher:

"[A]lthough we decline to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment, the fact that [the child] was speaking to his teachers remains highly relevant. Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police. We do not ignore that reality. In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing L. P.'s statements at trial."

*Id.* at 249 (internal citations omitted). Thus, the Court concluded, under all the circumstances, the child's statements to his teacher were not subject to the Confrontation Clause exclusion and could be admitted at trial.

In the state's view, *Clark* dictates that IP's statements here were not testimonial and were therefore admissible. In addition to arguing that Liberty House, like the teacher in *Clark*, is not law enforcement, the state focuses on the Court's comment in *Clark* that the statement of a small child will rarely, if ever, implicate the Confrontation Clause.

Defendant acknowledges the Court's comment in *Clark* that a young child's statements will rarely if ever be testimonial, but points out that the comment is *dicta*. Further, defendant notes, the Court did not say that a child's statements will *never* be testimonial. Defendant argues that, as the Court said in *Clark*, the Confrontation Clause analysis requires consideration of the context in which the statements were made; the age of the child was but one consideration. An additional part of context is the questioner's identity. *Clark*, 576 US at 249. Thus, defendant contends, the fact that the child might not make statements for testimonial purposes does not preclude a determination that the purpose of the medical examination was at least in part

investigative. Although defendant does not dispute that IP could not have intended his statement as a substitute for court testimony, defendant asserts that Liberty House's close connection with law enforcement means that the statements made in the context of the Liberty House examination are similar to those made to law enforcement outside of the context of an actual emergency.

Defendant's argument finds support in both the Oregon Supreme Court's opinion in *S. P.* and this court's opinion in *Moreno-Garcia*. Although decided before *Clark*, *S. P.* in fact foreshadowed the United States Supreme Court's holding in *Clark*. In *S. P.* the court said:

> "[W]hether a statement is testimonial *depends on an objective analysis of the contents and circumstances of the statement*, rather than an attempt to determine only the subjective intentions of the questioner or the declarant. We infer the purpose of an interrogation from the totality of the circumstances in which it took place and the results that it yielded."

346 Or at 613 (emphasis added); *see also id.* at 610 ("[T]he Court infers the purpose of the interrogation by objectively examining the statements that the declarant makes and the circumstances under which the declarant makes them."); *United States v. Norwood*, 982 F3d 1032, 1047 (7th Cir 2020) (whether statements made by child victims to sexual assault nurse examiner are testimonial requires evaluating whether the statements were made as part of an ongoing emergency, the age of the victim, and the presence of law enforcement at the examination). That context-specific approach is consistent with *Clark*. The state may be correct that the factor of the age of the child was afforded greater weight in *Clark* than in *S. P.*, but the analysis remains sound. Our opinion in *Moreno-Garcia* followed *S. P.* and adhered to that same analysis. 243 Or App at 578-80.

Moving on to application of that analysis here, we agree with defendant that, similar to the children's statements in *S. P.* and *Moreno-Garcia*, IP's statements to the Liberty House doctor were made to a medical professional who worked closely with law enforcement. The Salem police had referred IP's parents to Liberty House. Although

Williams, a forensic examiner, did not conduct a forensic interview with IP, she did observe the medical examination and take notes, and she testified that Liberty House regularly sends the assessment reports back to the referring party, generally the police and the Department of Human Services.

Additionally, as defendant further contends, the Liberty House medical examination of IP served a minimal diagnostic or medical purpose, because the child had already been examined in the hospital emergency department and by his family physician and, unlike in *Clark*, there was no ongoing emergency. Defendant did not live with IP, so the Liberty House interview was not for the purpose of preventing immediate harm to IP. For those reasons, we agree with defendant that, as in *S. P.* and *Moreno-Garcia*, IP's evaluation at Liberty House served a forensic purpose in addition to any diagnostic purpose, and that IP's statements to the Liberty House physician must be viewed as testimonial and should have been excluded.

We conclude, however, that the error in admitting the evidence of IP's statements does not require reversal. Under Article VII (Amended), section 3, of the Oregon Constitution, the judgment must be affirmed, "notwithstanding any error committed during the trial," if the error was harmless. In determining whether a federal constitutional error is harmless, the federal standard for harmless error applies:

> "[T]he conviction will be upheld, 'if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (describing the test announced in *Chapman* [*v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967)]). In reviewing the whole record to determine whether an error was harmless, the court should consider 'the importance of the [improperly admitted] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, * * * and, of course, the overall strength of the prosecution's case.' *Id.* at 684."

*State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006). Considering each of those factors, we conclude that the trial court's error was harmless beyond a reasonable doubt.

IP's statements to the Liberty House doctor were duplicative of and corroborated by his identical statements to his parents, who described the statements at trial without objection. Additionally, contrary to defendant's contention, the identification of defendant as the abuser did not depend solely on the credibility of IP's statements. There was evidence that IP had not been left alone in the care of his biological grandfathers. Additionally, other evidence corroborated IP's description of the abuse to his mother and father and its having occurred at the babysitter's house, including IP's demeanor when his father picked him up and IP's subsequent changes in behavior and demeanor, including his conduct toward his sister, changes in temperament, relapse in bed wetting, and unwillingness to have his clothes removed.

We are not persuaded by defendant's argument that the statements to the Liberty House doctor were qualitatively different from and more reliable than IP's statements because they were spontaneous; IP's statements to his mother were also spontaneous.

We reject defendant's contention that Williams's description of IP's statements to the doctor would have been more persuasive to the factfinder because Williams was an expert in forensic examination. Williams did not provide her opinion as an expert in forensics. She simply related the child's statements; the only opinion she offered was that the spontaneity of IP's statement indicated that the topic was on IP's mind but that it did not make the statement more reliable than the statement IP had made to his mother.

Additionally, we are not persuaded by defendant's contention that Williams's descriptions of IP's statements would have carried more weight with the factfinder because the statements were made to a doctor. Williams's testimony was not like the erroneously admitted medical testimony that we held in *Norby* could have been given more weight by the factfinder and was therefore not harmless. In *Norby*,

the statements of the child, A, were described by a CARES physician who had examined the child and who, based on both the physical examination and the child's statements, made a diagnosis of "highly concerning for sexual abuse." As here, other witnesses had also related the child's statement of abuse. But the child's statements to the physician in *Norby* were more detailed; additionally, the statements had aided the physician in *Norby* in making her diagnosis of abuse. We held for those reasons, and considering the role and status of the doctor, that, despite the cumulative nature of the evidence, its admission was not harmless. 218 Or App at 620.

Unlike in *Norby*, or in *State v. Alne*, 219 Or App 583, 589, 184 P3d 1164 (2008), *rev den*, 347 Or 365 (2009), also cited by defendant, Williams was not the person who had examined IP. She did not provide an opinion of sexual abuse. She simply related statements that IP had made to the doctor. Additionally, unlike in *Norby* and in *Alne*, IP's statements to the doctor, as related by Williams, were identical to those he had made to his mother. We do not conclude that the factfinder would have attributed greater weight to Williams's description of IP's statements to the doctor than to the statements IP made to his parents.

Finally, contrary to defendant's suggestion, there is no indication that the parents' line-up of photos was suggestive of defendant or that the parents otherwise influenced IP to identify defendant. We conclude that the erroneous admission of IP's statements to the Liberty House doctor could not have affected the court's verdict and that the trial court's error in admitting the evidence therefore was harmless beyond a reasonable doubt.

We turn to defendant's second assignment of error. Based on his sexual misconduct with IP, defendant was charged with first-degree sexual abuse, which a person commits if, among other things, the person "[s]ubjects another person to sexual contact." ORS 163.427(1)(a)(A). "'Sexual contact' means any touching of the sexual or other intimate parts of a person *** for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(6). In his second assignment of error, defendant contends that the

trial court erred in denying his motion for a judgment of acquittal, made on the ground that the evidence was legally insufficient to prove that defendant acted with a sexual purpose when he inserted his finger into IP's anus. Viewing the evidence, as we must, in the light most favorable to the state, we conclude that the sexual purpose of defendant's conduct can reasonably be inferred from the sexual nature of the contact itself, and that a rational trier of fact, making reasonable inferences, could have found that the state proved defendant's sexual purpose beyond a reasonable doubt. *See State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998) (stating standard of review).

We move on to defendant's third assignment of error. Defendant's conviction was subject to a mandatory sentence of 75 months' imprisonment under ORS 137.700. Defendant asked the court to impose a lesser sentence, *see* ORS 137.712(1) (authorizing a trial court to impose a lesser sentence for first-degree sexual abuse if justified by a substantial and compelling reason), contending that a 75-month sentence is disproportionate under the Oregon and United States constitutions.

A trial court is permitted to depart from the mandatory-minimum 75-month prison sentence requirement if it finds that the sentence would be unconstitutionally disproportionate, that is, if the court finds that a sentence would "shock the moral sense" of reasonable people. *State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009); *State v. Wheeler*, 343 Or 652, 668, 175 P3d 438 (2007). *Rodriguez/Buck* established three factors to be considered in making that determination: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." 347 Or at 58. Here, each of the factors weighs against a lesser sentence. The gravity of defendant's conduct, penetrating the anus of a three-year-old child who was entrusted to his care, was severe. Defendant's sentence is comparable to sentences imposed for other related crimes. *See, e.g.*, *State v. Camacho–Garcia*, 268 Or App 75, 81, 341 P3d 888 (2014), *rev den*, 357 Or 164 (2015) (75-month sentence for first-degree sexual abuse conviction

resulting from touching of breasts of 12-year-old girl not disproportionate). Finally, defendant has a long criminal history. Considering those factors, we conclude under the circumstances that defendant's 75-month sentence, although lengthy, is not so disproportionate as to shock the moral conscience of all reasonable persons.

Affirmed.